**METROPOLITAN LIFE INSURANCE COMPANY, Appellant,**

v.

**Lucille L. FUGATE, Appellee.**

**No. 19063.**

United States Court of Appeals
Fifth Circuit.

Jan. 23, 1963.

Rehearing Denied Feb. 28, 1963.

789

John Bell, John Arthur Jones, Knight, Bell & Jones, Tampa, Fla., for appellant.

James A. Franklin, Jr., John W. Emerson, Jr., Henderson, Franklin, Starnes & Holt, Fort Myers, Fla., for appellee.

Before RIVES, CAMERON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

Lucille L. Fugate sued Metropolitan Life Insurance Company, a New York corporation, in the Circuit Court of Lee County, Florida, because of the refusal of the company to pay her, as beneficiary and absolute owner, the proceeds of a policy issued by Metropolitan on August 25, 1959, in the amount of $100,000.00 upon the life of her husband, Fred J. Fugate, who died on May 24, 1960, while the policy was in force. She also claimed judg-

ment for interest and attorneys' fees, recoverable under Florida law, in addition to the full face amount of the policy. The cause was removed to the U. S. District Court for the Southern District of Florida and was tried by a jury. From a verdict and judgment in favor of Mrs. Fugate, Metropolitan has appealed.

Metropolitan admitted issuing the policy, the death of the insured during its continuance and its refusal to pay to Mrs. Fugate, the beneficiary, the proceeds of the policy; but denied the allegations that she and the insured had done and performed all and singular the matters and things required of them to entitle Mrs. Fugate to recover. In its second defense, an affirmative one, Metropolitan denied liability under the policy upon the grounds that the insured, Fred J. Fugate, had falsely answered "No" to the following 3 questions in the application for the policy:

"8(b) Have you ever used them (alcoholic beverages) to excess? If so, when and for how long?"

"5(a) Have you ever been a patient in or visited a hospital, clinic, dispensary or sanatorium for observation, examination or treatment?"

"5(f) Have you consulted any physician, healer or other practitioner within the past 5 years for any reason not mentioned above?"

As a matter of fact, it was proved at the trial by uncontradicted and unquestioned testimony that Mr. Fugate had been a patient at Lee Memorial Hospital from February 24, 1958 to March 4, 1958, and in White Cross Hospital from September 22, 1958 to October 2, 1958. He was treated for alcoholism or complaints resulting from drinking intoxicants in both hospitals.

Mrs. Fugate had applied for the policy as prospective owner and her husband as the prospective insured on April 30, 1959. The questions were answered in Part B of the application. Answers of the decedent in Part B 1 of the application were made to Dr. Vinson on May 1, 1959. The same answers were given by

the decedent to Dr. Perez in Part B 2, containing the same questions, on July 6, 1959. A policy of the size in question requires two examinations. The policy was issued on August 25, 1959, and the decedent died on May 24, 1960. The policy had been in existence for a period of 9 months before death. Metropolitan alleged that when it denied liability under the policy, it tendered to Mrs. Fugate, as owner and beneficiary, the amount of $4,496.00 as reimbursement for the four quarterly premiums paid.

Dr. House testified that he saw the decedent for the first time as a patient on February 24, 1958, when he came to the physician's office and complained of a cough, fever and sweats; and admittedly he had been drinking for several days and was intoxicated at the time. The decedent informed the physician that he was prone to drink daily for about 4 to 6 weeks at a time and then he would stop and return to normalcy until he started drinking again. The pretext used for drinking was a painful back. Mrs. Fugate accompanied her husband at the time of the visit to Dr. House, who informed them both that he could not treat the decedent unless he was admitted to a hospital so that he could be attended by nurses. Mr. Fugate resisted going to the hospital, but finally agreed to go that day and he was admitted.

Dr. House diagnosed the decedent's condition as delirium tremens resulting from the fact that he was deprived of alcohol in the hospital, which produced a disturbed brain physiology resulting in hallucinations. During his stay in the hospital, the decedent was unconscious at times and thrashed about the bed in an effort to get up. He was restrained with a wide leather wristband which was fastened with a belt to the bed frame. Dr. House explained that the decedent, Mr. Fugate, thought he saw bulldozers and draglines. He was a contractor. After the delirium tremens subsided, Dr. House lectured the decedent about drinking and released him on March 4, 1958. He was in the hospital approximately 8 days on this occasion.

Dr. McEwan testified that he was the former owner of White Cross Hospital and served as its Administrator for approximately 24 years until it was closed in 1959. This hospital was used chiefly for the treatment of alcoholism. Although the hospital had closed, the records had been preserved. These records were produced and identified. They showed that the deceased, Mr. Fugate, was admitted to the hospital on September 22, 1958. On this occasion, the admission form was completed by the head nurse on duty at the time. Charts with respect to Mr. Fugate were kept by the various nurses on duty. Nurse Cox was night supervisor when the decedent was admitted and she completed the admittance history, which bore the signatures of Mr. Fugate and Dr. Holecek. Nurse Cox testified that the information on the admittance history was obtained from the patient. She stated that when another accompanied the patient on admission, she made a notation to that effect and there was no such notation on the records relating to the decedent. There was a notation on the history admission sheet reading as follows:

"Years of drinking, 30 years. Periodical, 20 years, every 304 months, Steady 304 wks."

This notation was interpreted as meaning that the patient would engage in a period of drinking every 3 or 4 months and that certain of the periods of drinking would last 3 or 4 weeks. The history sheet further showed, "History of Delirium Tremens, 6 mos. ago", and "Nightmares frequently". Under "Remarks" on the first sheet of the nurses' chart is the notation, "Has been drinking one or two fifths of whiskey a day when drinking." The succeeding pages of the chart show that the decedent was given one and a half ounces of whiskey 45 times during the first 5 days of his 10 day stay in the hospital, exclusive of his first two drinks in the amount of one and a quarter ounces each. According to Dr. McEwan, this whiskey was given to the decedent to reduce the possibility of his having delirium tremens.

Neither of these episodes was mentioned in the application for insurance, although the last episode occurred only 7 months before the decedent gave his answers to Dr. Vinson stating that he had not been in a hospital, clinic, dispensary or sanatorium for observation, treatment or examination.[1] Approximately 9 months after the last hospital visit he made like statements to Dr. Perez in July 1959. Approximately 10 months elapsed between the last hospital visit and the issuance of the policy.

William Shafer, the chief underwriter for Metropolitan, testified that if the physicians who treated the decedent or the two hospitals which he had so recently attended had been mentioned in the application, even though the nature of the diagnosis or treatment had not been given, Metropolitan would have developed the details of the cause for hospital treatment and would have contacted the doctors in question to obtain full information as to the health of the decedent; all in accordance with the rules, policies and standards of the company. Witness Shafer further testified that if the company had been unable to obtain satisfactory details, it would have declined to issue the policy. He positively testified that it was the policy of the company not to issue insurance policies to people who had been under treatment for alcoholism or drinking unless 5 years had elapsed since a "cure" and there had been no relapse in the meantime. Mrs. Fugate presented a number of reputable witnesses who were friends and business associates of her deceased husband, who testified that they did not know of his drinking to excess.

After the testimony was in, Metropolitan moved for a directed verdict on the grounds that it had proved the substantial elements of its affirmative defense by a fair preponderance of the evidence; and that there was no evidence nor any inference which reasonably might be drawn from the evidence when viewed in the light most favorable to the plaintiff which could sustain a verdict in her favor. This motion was denied and the court charged the jury.

Metropolitan excepted to the court's refusal to give its requested Instruction No. 3[2] which was, of course, requested after the motion for a directed verdict and which in substance instructed the jury that if it found from the evidence that the decedent knowingly concealed from the insurance company the fact that he had twice been hospitalized, as above mentioned, when application was made for the policy, their verdict should be returned for the defendant. Metropolitan then objected to the court's instruction that if the jury found that the decedent did use intoxicating beverages, but not to such an extent as to constitute excessive use thereof as defined by the court,[3] then the decedent's answer in that respect would have been true and should not defeat recovery by the beneficiary. The jury found for Mrs. Fugate. Metropolitan then moved for a judgment N.O.V.; or in the alternative, for a new trial. The motion was denied. Metropolitan specifies as error the overruling of the several motions, the refusal to give Instruction No. 3, and the charge as given to the jury by the court.

■■ Metropolitan contends that under a 1959 statute of the State of Florida,

---

1. The application, in answer to another question, did disclose that the applicant had suffered from a ruptured intervertebral disk removed from the lower back in 1956.

2. "The Court instructs you that both of the hospitalizations, in Lee Memorial Hospital and in White Cross Hospital, are shown in this case to have been material to the acceptance of the risk by the defendant insurance company, and that, if

you find from the evidence that the applicant, Fred J. Fugate, knowingly concealed such hospitalizations, or either of them, from the defendant, when he applied for the policy sued upon, your verdict shall be returned for the defendant."

3. The definition of the word "used" was based on the opinion in Provident Savings Life Assurance Society v. Exchange Bank of Macon, 5 Cir., 1903, 126 F. 360.

it is not necessary for an insurance company to prove that a false representation in an application was made with the conscious design to conceal, or to have been fraudulently made.[4] Although not mentioned in the briefs, it was pointed out in oral argument that the policy in this case is dated August 25, 1959, and the statute did not become law until October 1, 1959. An insurance policy is a contract. The statute would only apply to insurance policies issued subsequent to the effective date of the statute, and hence we hold the statute not applicable in this case. This case must be decided according to the law of Florida as it existed prior to the effective date of the statute.

■ In deciding this case, we must deal with Metropolitan Life Ins. Co. v. Madden, 5 Cir., 1941, 117 F.2d 446; Metropolitan Life Ins. Co. v. Poole, 147 Fla. 686, 3 So.2d 386 (1941); Madden v. Metropolitan Life Ins. Co., 5 Cir., 1943, 138 F.2d 708, 151 A.L.R. 984; and Prudential Insurance Company of America v. Whittington, (Fla.App.), 98 So.2d 382, as well as other applicable cases. When the Madden case was before this court the first time (117 F.2d 446), it was held that an untrue answer to a question seeking to elicit a fact as to matter material to the risk, prevented a recovery without regard to whether the answer was given with a conscious intent to deceive. In the second Madden appeal after the decision by the Supreme Court of Florida in the Poole case, this court felt that the law of Florida had been changed and it was then concluded that a representation, though false, did not void the policy unless it was made with conscious intent to defraud, and that the determination of such conscious intent was *normally for*

*the jury.* The second Madden case however, further held that the case was not to be submitted to the jury in circumstances when " * * * the evidence admits of no other conclusion than that there was an intent to deceive * * *." To the same effect are the cases of Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 1949, 172 F.2d 183; and Roosth v. Lincoln National Life Insurance Co., 5 Cir., 1959, 269 F.2d 171.

In Prudential Insurance Company v. Whittington, (D.C.Ct. of Appeal Fla.2nd District 1957), 98 So.2d 382, essentially the same question was presented. In his opinion, Judge Pleus was critical of our decision in the second Madden case. The two concurring Judges in the Whittington case found it unnecessary to express an opinion with respect to the Poole case and the second Madden case. They concurred "in judgment only", but did conclude that the defendant insurance company:

" * * * carried the burden of proving the materiality of the questions asked, the falsity of the same and the bad faith on the part of the deceased. Since no proof was adduced by the plaintiff from which the jury could have concluded false answers in the policy were made in good faith, there was no issue of fact to go to the jury, and the Judge should have directed a verdict in favor of the defendant."

From a reading of the foregoing cases, including the second Madden case, we conclude and hold that a representation in an application for insurance, whether of fact or opinion, will not void the policy unless made with conscious intent to deceive, which is a matter for the jury to

---

4. Appellant cites § 627.01081, Florida Statutes, F.S.A.

"Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

"(1) Fraudulent; or

"(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

"(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."

decide *unless the evidence admits of no other conclusion.*

In the light of the foregoing, we must interpret the answers of the decedent to the questions involved here. We agree that the word "used" taken in context with question 8(b) ("Have you ever used them [alcoholic beverages] to excess?"), denotes more than an occasional excessive indulgence in alcohol. Provident Savings Life Assurance Society v. Exchange Bank of Macon, 5 Cir., 1903, 126 F. 360. It is contended that this question calls for the opinion of the applicant, and if the answer was made in good faith, the policy would not be vitiated. We are urged to conclude, as a matter of law, that the decedent's "No" answer to question 8(b), especially in view of the fact that it calls for 'an expression of opinion, and in the light of the evidence submitted, was not fraudulent as a matter of law; and that there was sufficient evidence on this question to submit the issue to the jury for decision as to whether the answer was made in good faith or not. Mrs. Fugate produced 12 friends and business associates, in addition to her own testimony, who testified to the effect that the decedent did not drink "to excess" to their knowledge. It is further asserted that the fact that the insured visited the two hospitals mentioned would not conclusively show, standing alone, that the insured "used" alcohol to excess; that such hospital visits would constitute evidence that the decedent did "use" alcohol to excess, but that the jury would not necessarily be bound by such evidence, in view of the other facts presented. In view of our decision as to the "No" answer to questions 5(a) and 5(f), it becomes unnecessary for us to decide whether the "No" answer to question 8(b) vitiated the policy as a matter of law.

■■ With regard to the "No" answers to questions 5(a) and 5(f), the record contains clear, unequivocal, convincing and uncontradicted evidence that the decedent did visit the two hospitals mentioned and was treated for some form of alcoholism. On one occasion he did have delirium tremens. The answers to these two questions are undeniably false. As to the matter of reliance and detriment, it is our opinion that alcoholism or the drinking of intoxicants is highly relevant to the issuance of an insurance policy and to the degree and amount of risk that an insurance company is willing to take. Whether acute, chronic or some other degree of alcoholism was present, may be a question for the jury to decide in a given case. We hold it was a jury question here. Visits to hospitals for treatment of alcoholism or the drinking of intoxicants is very strong evidence on behalf of the insurance company for the proposition that a serious question as to the excessive use of alcohol is present. To say the least, the insurance company in this case was entitled to know the facts with reference to the hospital visits, they were material facts, and it was prejudiced by the concealment of these facts.

■ We must now decide the question as to whether the concealment of this information as to the hospital visits by the decedent constituted fraud as a matter of law so as to void the policy in question under the reasoning of the second Madden case and the other cases herein mentioned. Black's Law Dictionary, 4th Ed., 1951, defines fraud as:

"An intentional perversion of the truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right; a false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury."

Further definitions of fraud may be found in Vol. 17A Words and Phrases, pp. 5–140. In Robbins v. Gould, 5 Cir., 1960, 278 F.2d 116, the necessary elements of fraud are categorized as follows:

"(1) a false statement concerning a specific material fact; (2) the rep-

resenter's knowledge that the representation is false; (3) an intention that the representation induce another to act upon it; and (4) consequent injury by the other party acting in reliance upon the representation."

In the Roosth case, 269 F.2d 171, 178, substantially the same elements are outlined:

"(1) A false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) and with intent to deceive; (5) with action taken in reliance upon the representation."

Viewing the evidence as favorable to the plaintiff as the record will permit, it is clear that the answers to questions 5(a) and 5(f) were false; the answers related to a material fact; certainly the decedent knew the facts which had so recently transpired; and he knew that his answers were not correct; and the policy was issued in reliance upon the answers. We cannot escape the conclusion that the information required by the answers was intentionally withheld. When the questions were first answered, the decedent had been in the White Cross Hospital for a period of 10 days only 7 months before. His answers disclosed an operation on his back several years prior to the issuance of the policy. In his own mind, the decedent may have thought that he was not suffering from alcoholism. There is no room for opinion about the hospital visits. With information as to the hospital visits in hand, the insurance company would have had a right to decide whether it disagreed with decedent or not, at least to the extent of deciding whether he should be considered too great a risk for a life insurance policy in the amount of $100,000.00. We conclude that the representations in answers to questions 5(a) and 5(f) in the application constituted sufficient fraud within the meaning of the word "fraud" to vitiate the policy. In the language of the second Madden case, " * * * the evidence admits of no other conclusion than that there was an intent to deceive * * *." Rhodes v. Metropolitan Life Ins. Co., supra, 5 Cir., 1949, 172 F.2d 183; Danaher v. United States, 8 Cir., 1950, 184 F.2d 673, 675; Meadors v. United States, (D.C.E.D.Ky., 1954), 118 F.Supp. 277, 280 (Affirmed 6 Cir., 219 F.2d 438); Mutual Life Ins. Co. of New York v. L. Hilton-Green, (1916), 241 U.S. 613, 36 S. Ct. 676, 60 L.Ed. 1202; Pence v. United States, (1942), 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510.[5]

In addition to the issues above mentioned, Mrs. Fugate most urgently contends that the falsity of the answers to questions 5(a) and 5(f) cannot be raised because the same was not alleged in the affirmative defense of the insurance company, Rule 8(a) F.R.Civ.P. In support of this argument, the following excerpt from the answer of Metropolitan is cited:

"If the true facts of Fred J. Fugate's *use of alcoholic beverages to excess* had been made known to the defendant as required by the application for the policy sued upon, defendant in good faith would not have issued the policy, and it would not have issued such a policy at the same premium rate as the policy provides, and it would not have issued such a policy

5. The following is from the Hilton-Green case:
"Considered in most favorable light possible, the above quoted incorrect statements in the application are material representations; and, nothing else appearing, if known to be untrue by assured when made, invalidate the policy without further proof of actual conscious design to defraud. (Citing cases)"
The following is from the opinion by Mr. Justice Jackson in the Pence case:

"His admissions left no room for conjecture as to the falsity of the previous statements in the application, and of his knowledge of such falsity. From these facts the requisite intent to defraud is presumed, and therefore need not be proven in the absence of countervailing evidence. Materiality and reliance were conclusively established by evidence introduced at the trial, if indeed such proof were needed."

in as large an amount as $100,000.-00." (Emphasis supplied)

It is contended that Metropolitan affirmatively raised only the issue of the "use of alcoholic beverages to excess" and no other; that there is no allegation in the answer to the effect that if the true facts regarding the hospitalization of the decedent were known, that Metropolitan would not have issued the policy. She claims that the answers to questions 5(a) and 5(f) were admitted in evidence and considered by the court and jury only insofar as they related to the only defense pleaded by Metropolitan, that is, the decedent's "use" of alcoholic beverages to excess which was the information sought by question 8(b).

■■ The spirit of the Federal Rules of Civil Procedure requires us to construe the pleadings in any given case most strongly in favor of the pleader. The second defense of the answer was the affirmative one, and when construed most strongly in favor of the pleader, clearly shows that the mentioned issue was raised. The answer states that the company denies recovery on "the following grounds", followed by a statement of the answers given to question 8(b), a statement relative to the two hospital visits for treatment from the use of alcohol and then the following allegation is made:

"The facts stated above render false the answers "No" to Questions 5(a) and 5(f) in Part BI and in Part BII of the application."

Following the above quoted excerpt is the presentation of the defense upon which Mrs. Fugate relies to narrow the issue. In our view, even if it be argued that the false answers to questions 5(a) and 5(f) do not constitute a separate defense under the pleadings as framed, the fact remains that these false answers are before this court whether they relate to another issue or not, and such answers are deemed to be material to the risk of the insurance company. At the trial there was no objection to the introduction of evidence pertaining to the decedent's answers to questions 5(a) and 5(f), nor was there any limitation placed upon the receipt of this evidence by way of stating that it related only to the representation made in answer to question 8(b). Rule 15(b) F.R.Civ.P. provides as follows:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues."

Counsel for Mrs. Fugate insists that failure to object to the evidence pertaining to questions 5(a) and 5(f) cannot be construed to mean that these issues were tried by express or implied consent. We do not agree with such contentions. From the record before us, it appears clear that the insurance company was trying the case on the theory that false answers to questions 5(a) and 5(f) voided the policy. Such conclusion is supported by the fact that the point here pressed by Mrs. Fugate was not raised at any time until the case reached us on appeal. Vernon Lumber Company v. Harcen Construction Co., 2 Cir., 1946, 155 F.2d 348. It should be noted that Rule 15(b) is not permissive in its terms, but unequivocally states that issues tried by express or implied consent shall be treated as if raised by the pleadings. If there had been objection to such evidence; or if Mrs. Fugate had attempted to limit its receipt, it would have been the duty of the trial court to permit an amendment. Such an amendment would not have prejudiced the case of Mrs. Fugate. Watson v. Cannon Shoe Co., 5 Cir. 1948, 165 F.2d 311.

■ Rule 15(b) of course, is applicable to defenses as well as claims, and to the extent to which it is applicable, it operates as an exception to the rule that defenses not pleaded are waived. Moore's Federal Practice, 2d Ed. p. 846. In a given case, the fact that a defense has not

been pleaded formally is immaterial if the issue was tried by express or implied consent. Haskins v. Roseberry, 9 Cir., 1941, 119 F.2d 803. Consequently, we hold that the matter of the falsity of the answers to questions 5(a) and 5(f) were before the trial court.

For the foregoing reasons, the judgment of the lower court is Reversed and judgment is here Rendered in favor of appellant, Metropolitan Life Insurance Company.

Reversed and rendered.

CAMERON, Circuit Judge (dissenting).

I respectfully dissent from the decision of the majority that appellee is barred from her right to recover on this insurance policy based upon its holding that, as a matter of law, the insured falsely and fraudulently answered questions 5(a) and 5(f) of the application. For convenient reference, these questions are copied in the margin in the order in which they appeared in the application.[1] This conclusion was reached by the majority although it held that question 8(b) and its answer were properly submitted to the jury; and it declined to hold, as a matter of law, that the policy was vitiated by the decedent's answer to the question dealing with excessive use of alcohol.

With deference, I cannot agree with the majority's conclusion because I think that, considering all of the answers in the application as a whole, a jury question was presented as to whether Fugate was guilty of fraud in his application; and because the insurance company in its pleadings asserted that the question 5 answers were rendered false only by its claim that the negative answer to question 8(b) was false and fraudulent, and did not rely on the question 5 answers

as an independent ground of defense. The latter reason will be considered first.

The majority devotes several pages of the opinion to a discussion of Mrs. Fugate's contention that the affirmative pleading of Metropolitan upon which the case was tried did not predicate a separate and independent defense upon the asserted false answers to 5(a) and (f) and did not contend that these answers, standing alone and not related to the charge of excessive drinking, would avoid the policy.

The opinion quotes Rule 15(b), F.R. Civ.P., and argues that evidence concerning the 5(a) and (f) answers was admitted without objection and concludes, as I construe the opinion, that the pleading did present such independent ground of defense. This statement in the opinion seems to epitomize the holding:

"From the record before us, it appears clear that the insurance company was trying the case on the theory that false answers to questions 5(a) and 5(f) voided the policy."

Nobody knows, I assume, what was in the mind of the insurance company. But I think the record shows beyond doubt that the pleading filed by Metropolitan was not susceptible of such a construction as the majority puts upon it; and it is equally clear that the District Judge did not proceed upon the theory the majority attributes to Metropolitan. The language of the affirmative plea, the charge of the court and its refusal of the instruction quoted in footnote 2 of the majority opinion completely reject the thesis that there was any defense offered by Metropolitan beyond the alleged false answer to question 8(b) dealing with the excessive use of alcoholic beverages; and they demonstrate that the answers to questions 5(a) and (f) were brought in by the pleading and considered by the court and

---

1. "5(a) Have you ever been a patient in or visited a hospital, clinic, dispensary or sanatorium for observation, examination or treatment?"

"(f) Have you consulted any physician, healer or other practitioner within the past 5 years for any reason not mentioned above?"

"8(b) Have you aver used them [alcoholic beverages] to excess? If so, when and for how long?"

jury solely as evidence tending to prove the alleged falsity of the 8(b) answer.

Substantially the entire Second Defense is copied in the margin at this point.[2] The entire case before the jury was based upon that defense. It seems to me clear that this pleading shows plainly that the company's sole reliance was placed upon the claim that Question 8(b) concerning the excessive use of alcoholic beverages had been deliberately answered falsely by the insured and that this false answer barred the appellee's right to recover for the insured's death. This construction of the scope and meaning of the Second Defense is borne out, according to my opinion, by every paragraph in it.

After setting forth that the insured had answered question 8 as set forth in the footnote, the entire questions and answers being copied verbatim in the pleading, it is asserted that the answers given were false in that insured had used alcoholic beverages to such extent that insured had been a patient in two hospitals for treatment for alcoholism and had been treated by Dr. Rumberg for the results of "excessive drinking of alcoholic beverages." Only then did the pleading assert that *"The facts stated above* render false the answers 'No' to questions 5(a) and 5(f) * * *"* Emphasis added.) *The language of these two questions was not even copied in the pleading, as was the language of question 8 and its subdivisions.*

The pleading then continued with the statement that "If the true facts of Fred J. Fugate's use of alcoholic beverages to excess had been made known", the policy would not have been issued. The final paragraph of the pleading makes it clear that the company was charging only that "The aforesaid incorrect statements in the application for the policy sued upon were misrepresentations and a concealment *of facts as to Fred J. Fugate's use*

**2.** "Defendant denies liability under the policy sued upon and says that plaintiff's recovery thereunder should be prevented upon the following grounds, to-wit:

"Question No. 8 in the two sheets designated Part B I and Part B II of the application for the policy sued upon is as follows:

" '8(a) To what extent do you use alcoholic beverages?

" '(b) Have you ever used them to excess? If so, when and for how long?'

"The answer to question 8(a) in Part B I is: 'Socially or light,' and the answer to the same question in Part B II is: 'Formerly social. None for past 10–11 months.'

"Question 8(b) is answered 'No' in both Part B I and Part B II.

"Those answers were and *are false in that the applicant Fred J. Fugate had used alcoholic beverages to excess and to such extent* that he had been a patient in two hospitals for observation and treatment by physicians for alcoholism. Specifically, he was a patient in Lee Memorial Hospital at Fort Myers, Florida, from February 24 to March 4, 1958, during which time he was treated by Dr. Curtis R. House of Fort Myers for conditions resulting from chronic alcoholism.

"Also, from September 22 to approximately September 30, 1958, he was a patient in White Cross Hospital at St. Petersburg, Florida, during which confinement he was treated by Dr. Frank Holecek of St. Petersburg for alcoholism.

"Also, in July of 1956, he was treated at his home in Fort Myers by Dr. Wilson A. Rumberger of Fort Myers for the results of excessive drinking of alcoholic beverages.

"The facts stated above render false the answers 'No' to Questions 5(a) and 5 (f) in Part B I and Part B II of the application.

"If the true facts of Fred J. Fugate's use of alcoholic beverages to excess had been made known to defendant as required by the application for the policy sued upon, defendant in good faith would not have issued the policy, and it would not have issued such a policy at the same premium rate as the policy provides, and it would not have issued such a policy in as large an amount as $100,000.00.

"The aforesaid incorrect statements in the application for the policy sued upon *were misrepresentations and a concealment of facts as to Fred J. Fugate's use of alcoholic beverages to excess* which were material to the acceptance of the risk by defendant and also were material to the hazard assumed by the defendant." [Emphasis added.]

*of alcoholic beverages to excess.  *  *"*
[Emphasis added.]

The pleading does not, therefore, quote the language of questions 5(a) and (f) as being the basis of a substantive defense to the action upon the policy or at all. It does not make the claim that the denial by Fugate of consultations with physicians or of trips to the hospital were, of themselves, material to anything but the alleged excessive use of alcohol or were intended as independent defenses to the action upon the policy. These allegedly false answers were relied upon in the pleading solely as evidence of the charge that the insured had knowingly concealed his asserted excessive use of alcohol and, as proof of that defense, which was, in my opinion, the only defense presented to the court below by the pleading.

Before the charge of the court was given or the case was presented to the jury, the court had refused Metropolitan's requested instruction No. 3, which is recopied in the margin.[3] That instruction sought to present to the jury the contention that the mere proof that Fugate had knowingly concealed his hospitalizations in Lee Memorial and White Cross Hospitals would avoid the policy. The refusal of the instruction was manifestly upon the ground that no such issue had been raised by the company's pleading. If Metropolitan had desired to rely upon the defense contained in the refused instruction, it had the opportunity to ask that the pleadings be amended so as to permit reliance upon such a defense. This course was not followed, and the court proceeded to charge the jury in line with the allegations of the pleading, that is, that the answers to Questions 5(a) and (f) should be considered only in connection with the defense of excessive use of alcohol. It will be necessary to quote rather extensively from the charge to demonstrate that this is true. Pertinent parts of the charge are copied in the margin.[4]

*The record* shows without question that the court below, the correctness of whose actions we are testing, did not "try the case on the theory that false answers to questions 5(a) and 5(f) voided the policy." Moreover, the record does not disclose that anything was done by the

3. "The Court instructs you that both of the hospitalizations, in Lee Memorial Hospital and in White Cross Hospital, are shown in this case to have been material to the acceptance of the risk by the defendant insurance company, and that, if you find from the evidence that the applicant, Fred J. Fugate, knowingly concealed such hospitalizations, or either of them, from the defendant, when he applied for the policy sued upon, your verdict shall be returned for the defendant."

4. "The defendant, * * * by its Answer, admits the issuance and delivery of the policy of insurance, and admits that proof was furnished to the company of the death of the deceased, Fred J. Fugate, and that demand for payment of the amount of the policy has been made by Lucille Fugate, * * * and admits that the said life insurance company has not paid the amount of said policy to the plaintiff.

"By way of defense the insurance company says that it should not be required to make payment of the amount under its policy of insurance because, as it says,

* * * Fred J. Fugate, in the application for the insurance made by the deceased, * * * was asked this question:

"To what extent do you use intoxicating beverages?

"And he, the deceased, answered: Socially or light, and formerly, socially, none for the past ten, eleven months.

"And he the said Fred J. Fugate was also asked the question: Have you ever used them, intoxicating beverages, to excess, and if so, when and for how long?

"And he answered the said question: No.

"The insurance company alleges that *those answers were and are false in that the said Fred J. Fugate had used alcoholic beverages to excess, and to such an extent that he had been a patient in two hospitals* for observation and treatment by physicians for alcoholism, and was treated in his home in Fort Myers for the results of excessive drinking of alcoholic beverages.

"The defendant further alleges that in the application for insurance the said Fred J. Fugate was asked in sub section 5(a), this question: Have you ever

appellee to mislead Metropolitan or the court. It was Metropolitan's defense which was being tried, and the burden rested upon it to plead its defense properly and to develop the record in such a way as to bring it properly before the court.

This is not a case, in my opinion, in which, under Rule 15(b), an unpleaded issue was brought into the case by consent of the parties. As is stated in 3 Moore's Federal Practice, 2d Ed., page 847: "As has been indicated, there must

ordinarily be either express or implied consent of the parties for the trial of issues not raised in the pleadings * * * Implied consent usually is found where one party raises an issue material to the other party's case, or where evidence is introduced without objection * * * " It appearing that the issue was not raised by the pleading, it is, I think, equally clear that there was no consent by waiver on appellee's part arising from the reception, without objection, of evidence relating to the omitted defense.

been a patient in or visited a hospital, clinic, dispensary or sanitorium for observation, examination or treatment?

"And to this question Fred Fugate answered: No.

"And then he was further asked: Have you consulted any physician, healer, or other practitioner within the past five years for any reason not mentioned?

"And to this question the deceased answered: No.

"The defendant alleges that the facts stated with reference to the treatment of the said Fred J. Fugate [i. e., in connection with excessive use of alcohol] renders false the answers to questions 5 (a) and 5(f), just referred to.

"Defendant further alleges that if the true facts of *Fred J. Fugate's use of alcoholic beverages* to excess had been made known to defendant insurance company, as required by the application for the policy, then the defendant insurance company would not have issued the policy. * * *

"The defendant further alleges that the statements in the application for the policy sued upon *were misrepresentations and concealments of facts as to Fred J. Fugate's use of alcoholic beverages to excess* which were material to the acceptance of the risk by the defendant and also were material to the hazard assumed by the defendant. * * *

"The Court further charges the jury that Part (a) of Question 8, in Parts (B–1) and (B–2) of the application for insurance here involved reading:

"To what extent do you use alcoholic beverages:

"Relates to the respective times when the answers thereto were made by the applicant, while part (b) of the same question 8, reading: Have you ever used them to excess? If so, when and for how long?—related to any time prior to the respective times when the answers

thereto were made by the applicant, that is, at the time of application for insurance. * * *

"Now, as the jury has already been instructed and as the Court has pointed out, the defendant insurance company claims that it was misled by the insured's that is, Mr. Fugate's, answer to the question whether he, Mr. Fugate had ever used alcoholic beverages to excess by his answer in the negative; in other words, the insurance company claims that it relied upon his answer that he had not theretofore, that is at the time of the application, used alcoholic beverages to excess, and of course the defendant claims that Mr. Fugate at the time he answered this question had before then used intoxicating beverages to excess, and that he knew that he had done so, and that his answer in that respect was false. * * *

"On the other hand, if the jury find from a preponderance of the evidence that Mr. Fugate did during the time inquired about in his application use to excess intoxicating beverages, then if he knowingly gave the insurance company a false answer in that respect, as the insurance company claims he did, then the plaintiff in this case could not recover. * * *

"In determining good or bad faith of the answer of the insured *in connection with the claimed misrepresentation, the jury may take into consideration all of the facts and circumstances proved in connection with Mr. Fugate's visit and treatment in the hospital* in Fort Myers, as well as his visit and treatment in the hospital in St. Petersburg, and his treatment by any doctor or institution on account of his use of alcoholic beverages *as bearing upon whether he used alcoholic beverages to excess and his knowledge thereof, * * * "* [Emphasis added]

All of the evidence concerning the answers given by insured to questions 5(a) and (f) and of his consultation with doctors was relevant and admissible as evidence in support of the defense of excessive use of beverage alcohol. The affirmative defense specifically referred to these answers as evidence that the answer to question 8(b) was false. No valid objection could have been made to the reception of that evidence for the restricted purpose, and none was made. Moreover, the court below restricted it to the purpose relied upon in the answer and appellant did not except to the court's action in so restricting it. Under these circumstances, I do not see how the court below can be put in error for trying the case in strict observance of the pleadings as filed. We are bound to test the actions of the trial court by the record in the case, and the record, in my opinion, admits of no other interpretation.

In fact, it appears to me that the appellant is the one who is presenting a new theory in its contention before us that it was entitled to a directed verdict on the ground that the insured's asserted false answers to Questions 5(a) and (f) were sufficient to vitiate the policy independent of the defense of excessive use of alcohol. This cannot be done under well settled principles of law that the reviewing court will consider a case only upon the theory upon which it was tried in the court below as revealed by the record.[5]

Metropolitan's affirmative defense of fraud in the application is the only thing which is before us, as it was the only thing before the court below. Whether Fugate practiced fraud must be determined by considering all of the testimony in the record, including that relating to all of the answers to all of the questions put to him in the application. The essence of the affirmative defense was that Fugate had been an excessive user of alcohol and that he falsely stated that he had not. A part of the insurance company's proof was that he had twice been a patient in hospitals for alcoholics and had fraudulently concealed these facts.

But the company put ten witnesses on the stand who gave more than one hundred sixty pages of testimony substantially all of which related to the question of whether insured used alcohol excessively. No witness was produced beyond doctors and nurses who stated that he had ever seen him intoxicated or heard that he used alcohol to excess. The insured had lived in small communities and this failure to produce such a witness was entitled to consideration by the jury.

The fact is that I fail to find any evidence in the record tending to support Metropolitan's contention that the negative answer to question 8(b) was false, except the evidence of the two undisclosed hospital visits. In testing that answer in the light of the answers to questions 5(a) and (f), it is necessary to view the duplicate applications signed by the insured in their entirety.

Metropolitan's prepared form of application presented twenty-nine questions counting each subdivision as a separate question. These questions were, in turn, divided into eight sections, each divided from the other by a line extending entirely across the sheet. The first and second sections had to do with the applicant's present state of health and a history of his illnesses. The third section propounded eleven questions all dealing with whether the applicant had *ever* been treated for or sought advice concerning eleven different ailments or series of ailments. Some of these individual subdivisions referred to eight separate diseases and some were cast in very general terms.

Immediately following the third section is found the six subdivisions of question No. 5 (section four). Subdivision (a) (quoted above, which queried whether the applicant had been a patient in or visited a hospital, clinic, dispensary or sanitarium for observation, examination or treatment) in each of the two applica-

5. Nelson Weaver Realty Co. v. Commissioner of Internal Revenue, 5 Cir., 1962, 307 F.2d 897, 903–904, fn. 6; 5 Am. Jur.2d, Appeal and Error, § 546, p. 31.

tions showed a negative answer to that query. Yet, the doctors who wrote down the answers explained in the righthand column that the applicant had had two major operations besides electrocardiograms, X-ray examinations, periodic physical check-ups, and other professional attention, which would normally carry him to a hospital, clinic or dispensary. Subdivision (f) of the same number asked if applicant had consulted any physician, healer or other practitioner *for any reason not mentioned above*, and each doctor placed a negative answer after that question. All of the questions in section four and the preceding sections had to do with illness and disease. The answer given to the crucial question concerning alcoholic beverages ought to be interpreted in the light of its relationship to the questions comprising the residue of the application.

The questions in sections five and six related entirely to such matters as prior applications for pension or disability benefits, military service and rejection by other life insurance companies. These two sections separated the four sections relating to sickness and disease from the crucial eighth question. The inclusion of the query concerning hospital visits and consultation of a physician *in the portion of the application devoted exclusively to diseases would be likely to suggest to the average person that the questions were related to diseases alone*—or so the jury would be warranted in inferring.

The exact wording of question 8 should be observed. It relates to *use* alone and it relates solely to *beverage* alcohol.

In charging the jury the court below read a portion of the opinion of this Court in Provident Savings Life Assurance Society, supra,[6] and a brief quotation from that case in which we quoted with approval the language of the trial court—is illuminating:

" * * * The word 'used' adopted for the purpose of this question does not imply an occasional indulgence in strong drink. It means to be accustomed, to make the practice of. * * * It is a word which is synonymous with—that is, meaning the same with—'custom' or 'habit,' or, in this case, 'habitual indulgence.' * * * as I construe the language of those questions, the defendant has sought to guard against men who habitually use ardent drink, and especially against those who ever habitually drink to excess. * * * The Supreme Court of the United States in the case of Insurance Company v. Foley [105 U.S. 350, 26 L.Ed. 1055] passed upon practically the same question, and that decision * * * is controlling. There the inquiry was, 'Is the party of temperate habits?' 'Has he always been so?' The answers were 'Yes.' The insurance companies contended that that was not true. One witness testified that in 1871 and in 1872 he was the family physician of the insured; that at that time the insured was drinking hard; that during the year he attended him for delirium tremens, and once or twice for indisposition produced, as he thought, from the excessive use of intoxicating drink; and that he regarded him as a man of intemperate habits. * * The court in passing on these facts said ' * * * His occasional use of intoxicating liquors did not render him a man of intemperate habits, nor would an exceptional case of excess justify the application of this character to him. * * * An attack of delirium tremens may sometimes follow a single excessive indulgence. * * *' "

In my opinion, there is considerable question whether the evidence shows that the insured ever partook of *beverage alcohol* to excess. When that term is employed, especially in connection with the

---

6. Reported at 126 F. 360. Its holding is in line with the general rule. See, e. g., annotation in 26 A.L.R. pp. 1279, et seq., and Brennan v. National Life & Accident Insurance Co., (1929), 14 La.App. 598, 122 So. 147; and Penn Mutual Life Ins. Co. v. Nunnery, (1936), 176 Miss. 197, 167 So. 416.

verb "used," one's thoughts turn instinctively to social drinking, to those who imbibe in order to get "tight" enough to forget their troubles; to love everybody; to drive dull care away, and to dissolve themselves into ecstacies.

That is not the way Fugate drank, certainly in the latter years of his life when the supposed two episodes of excessive use of alcohol took place. He had joined the church in March, 1958, and his wife stated that he did no convivial drinking after that. He remained at home every night and did not belong to any social club. He drank only when his back was hurting him and in an effort to *dull the pain.* For several years he suffered from a ruptured vertebral disc, which was operated on in 1956. The pain continued until after both hospitalizations took place. The testimony of the doctors indicated that, upon the occasions when he appeared to have been drinking, he told them that he had done so to alleviate his pain.

According to his wife, his pain had been so excruciating that he was compelled to walk and could not sit still and be comfortable. At one time, the doctor prescribed an elevation of one of his shoes.

With respect to the visit to the White Cross Hospital, where alcoholics were treated, this trip was made at the insured's own instance.[8] Mrs. Fugate took him to the hospital and the doctors did not desire that she visit him, but she talked with him every night on the telephone and found him normal and in good spirits.

Before she took him to the White Cross Hospital he had been drinking steadily about four or five hours because of the pain. Prior to that time he had not had a drink in one or two weeks. After he returned from the hospital, he never took another drink until his death, was in fine spirits and the pain which had caused the drinking had lessened or ceased.

His wife's testimony, therefore, confirmed to some extent by the doctors, affirmed that the two trips to the hospital were the result, not of Fugate's "using of beverage alcohol", but of taking alcohol as a medicine to lessen pain, which he was admittedly suffering.

I do not find that any witness testified that the insured had ever made excessive use of alcohol as a beverage. On the other hand, a dozen or more witnesses gave testimony to the contrary. Two of Fugate's business partners and one of his foremen, all of whom saw him practically every day; the vice president of the bank, which made open loans to him, who was in constant personal contact with Fugate and had investigations made about his use of alcohol; a neighbor whose home was located approximately fifty to sixty feet from Fugate's home and who had an occasional drink with him, saw him constantly and was close enough to hear if anything unusual went on in the home; a salesman of heavy equipment who made a number of sales to the deceased and investigated his standing in the community, including his addiction vel non to the use of alcohol; the deceased's fishing companion, and a half dozen others gave positive testimony that they had never known him to drink to excess and had never heard of his excessive use of alcohol. The chief underwriter for the insurance company who had studied all of the file, admitted that the file contained nothing but favorable comment concerning the insured and alcohol. The twelve-page retail credit report containing statements from friends, business associates and neighbors of the deceased showed without dispute that nobody knew or had heard of any excessive drinking by the insured.

The case was tried below by a Judge of long experience who, for many decades,

---

8. "Q. Relative, Mrs. Fugate, to the White Cross Hospital in 1958, tell us if you will what led up to Mr. Fugate's going there? "A. Well, after Dr. House treated him and advised him about the lift [elevation of his shoe] and he realized that he was getting relief from the lift he *decided that he had acquired a taste for alcohol and he wanted to quit. It was his own idea.*" [Emphasis added.]

had held the respect of those acquainted with his services as state court judge and his work as United States District Judge. At the conclusion of the case, the trial court stated to the jury:

"I want to thank each one of you jurors for serving on this jury and for the close attention that the Court observed that you gave to this case. And your verdict, of course, is supported by evidence, sufficient evidence * * *"

The evidence which I have briefly outlined, coupled with the fact that Fugate applied for the insurance only after he had been importuned at his home three or four times by the insurance agent who stressed that he should take out a policy because he was subject to the constant hazard of working with heavy machinery, which was his line of business, I think points to the soundness of the trial court's statement to the jury.

It is axiomatic that questions of fraud are normally for jury decision. This Court once said:[9] "Fraud * * * is difficult to define; there is no absolute rule as to what facts constitute fraud; and the law does not provide one 'lest knavish ingenuity may avoid it.'" This, it seems to me, is a typical case for the recognition of the foregoing rule. I think that the court below acted wisely when it submitted the question to the jury and declined to set its verdict aside.

All of this fails to take note of the universally accepted fact that fraud must be established by clear and convincing evidence and the party asserting it has the burden of proving it with reasonable certainty by a preponderance of convincing evidence.[10] Mr. Justice Story expressed the idea in memorable words in Prevost v. Gratz, 6 Wheat. 481, 496, 5 L.Ed. 311:

"Fraud, or breach of trust, ought not lightly to be imputed to the living; for the legal presumption is

the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty, to disturb their ashes, and violate the sanctity of the grave, unless the evidence of fraud be clear, beyond a reasonable doubt."

I respectfully dissent.

9.  White et al. v. Union Producing Co., 5 Cir., 1944, 140 F.2d 176, 178.

10. Jemison v. Commissioner of Internal Revenue, 5 Cir., 1930, 45 F.2d 4; Roosth v. Lincoln National Life Ins. Co., 5 Cir., 1959, 269 F.2d 171, 179.