**GEORGE COHEN SONS & COMPANY, Ltd., Plaintiff, Appellant,**

v.

**Daniel KOCH, Defendant, Appellee.**

**No. 6718.**

United States Court of Appeals
First Circuit.

Heard Feb. 9, 1967.

Decided May 1, 1967.

Walter L. Newsom, Jr., San Juan, P. R., with whom Enrique Cordova Diaz and Brown, Newsom & Cordova, San Juan, P. R., were on brief, for appellant.

Robert H. Ruskin, with whom Parke, Graves, Rodriguez-Maduro, Santurce, P. R., was on brief, for appellee.

Before ALDRICH, Chief Judge, MARIS * and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This appeal challenges damages awarded the owner of a crane which was attached by mistake.

It would be difficult to imagine a series of events more permeated by miscalculation on the part of all concerned than those presented here. Appellant (Cohen) held a mortgage on several items of construction equipment to secure an obligation from one Goldman. Cohen brought suit against Goldman and others in May 1962, ordering the attachment of all items described in his mortgage, including a Bucyrus Erie crane "complete with boom and electric wiring for magnet (painted yellow)".

The marshal proceeded on July 6, 1962, to attach a gray Bucyrus Erie crane without boom, which appellee (Koch) had just bought from Puerto Rico Smelting and Refining Corporation. Koch also had the crane described in the mortgage, but this was not attached. The marshal apparently did nothing with the crane; *custodia legis* was the field where he found it and apparently left it.

As soon as Koch "got the attachment" he consulted an attorney. Then, instead of informing the court, the marshal, or Cohen that the wrong crane had been attached, putting up bond, or intervening in the action, Fed.R.Civ.P. 24(a) (3), he did nothing. According to Koch, his attorney told him "We can't get it until we go to trial." [1]

On July 24, Cohen brought suit against Koch and one Eboly, alleging that both had bought mortgaged equipment from Goldman and seeking foreclosure of the mortgage. Service was made on Koch almost a month later, on August 21. Finally, on September 10, two months after the attachment, Koch acted by filing an answer and counterclaim to Cohen's suit against him. Instead of attacking the mortgage for invalid recording (as his codefendant Eboly did successfully) or setting forth the truth as to the identity of the crane, he alleged that he was the owner of the crane described in the mortgage and that Cohen had indeed attached that crane.

As if this were not confusion enough, the Rexach Construction Company, which

---

* By designation.

1. In a motion filed after trial present counsel for Koch asserts that the attorney in question would testify that "on several occasions" he told Cohen's counsel that the wrong crane had been seized. We do not have an indication of the time of these conversations and nothing in the record to evidence them. While appellee testified, "I told everybody. I told Rexach, the attorneys, and anybody that listened to me, that this wasn't the right crane * * *.", there is no more specific evidence as to the time or occasion of such revelations. Indeed, reference to Rexach (see infra) would indicate that any disclosures came late in the calendar of this controversy.

had purchased from an estate the property on which the crane was located, discovered it in late October, rusty and its shop, repaired it, and proceeded to "entirely covered by bushes", took it to use it in a quarry for the next two years.

On October 30, the court entered an order dismissing Cohen's complaint against codefendant Eboly because the mortgage had not been recorded in all districts where the property was located and in the district of mortgagor's residence at time of execution. No parallel motion to dismiss was made by Koch.

Despite Koch's avowed anxiety to recapture the crane to take advantage of an oral offer by a construction company to rent the crane on very lucrative terms, nothing happened for sixteen months. Then, in March 1964, new counsel appeared for Koch and began to press for action. A pre-trial conference was held on March 17, at which Cohen was told, apparently for the first time, that a mistake had been made and allegedly admitted that it did not have the crane. On April 5, according to an affidavit of Koch's counsel, Cohen said that it was "reasonably sure" that Rexach had the crane. Two days later Koch's counsel wrote Cohen's counsel: "I understand that you may be able to locate the machine." Settlement efforts then followed, to no avail. Finally, on June 29, 1964, the court dismissed Cohen's complaint against Koch, and on August 12 it ordered Cohen to return the crane within thirty days. On September 8, Cohen asked to be relieved from the order, alleging that Rexach was in possession of the crane, claiming ownership. Under court order Rexach appeared in court on October 2. Its attorney then offered to turn over the crane in return for release of all claims by both Cohen and Koch. The releases were given orally, and the crane was finally returned.

Liability being conceded, trial on damages was then had before the court, in February 1965, resulting in a judgment for Koch in the amount of $17,500, representing 27 months of lost rentals at $800 a month, assuming the crane would have been rented about 90 per cent of the time.[2] We note that, on this basis, the judgment should have been for $19,440 ($800 x 27 x 90%). Our problem, however, is deeper than mathematics.

From a reading of the entire record before us we cannot escape the conclusion that, until sometime in the spring of 1964, appellee Koch failed to make any efforts to avoid the accumulation of damages. Immediately after the crane was attached, he made no effort to lift the attachment and—so far as we know on this record—no effort to communicate the fact of the mistake to the court, to the marshal, or to opposing counsel. We are told that the reason he did not want to reveal that the wrong crane had been taken was that he also had the right crane. It may be that he valued uninterrupted possession of the latter more than the restoration of the former. Such an "excuse", while possibly pertinent to tactics at the time, seems to us to be of no help to him on the issue of avoiding damages.

When he did file his counterclaim, he complicated matters further by averring that the mortgaged crane had been attached. Although codefendant Eboly promptly and successfully attacked the validity of the mortgage, no action was forthcoming from Koch.[3] Nor did he make an effort to enter the suit against Goldman or to discharge the attachment.

2. In fact there was no evidence that the crane would have been rented 90% of the time. We assume that the court was referring to testimony that 90% of rental revenues was profit after maintenance, repairs, and depreciation. We do not mean by silence to endorse the finding that $800 was the probable monthly rental. On remand that issue, as well as those considered here, will be open.

3. Counsel for Koch argues that Cohen, after losing the Eboly case on the ground of defective registration of the mortgage, could have itself avoided further accumulation of damages by returning the crane forthwith. But for all this record shows, Cohen might legitimately have thought its claim to be good as against Koch despite the defective recording. for example, Koch denied that he had

The crane in question, over 20 years old, delivered by the manufacturer to the U. S. War Department in 1941, was sold to Koch in 1962 for $2,000. He invested some $6,000 in repairing it. Accepting his estimate of value of $10,000, and the court's finding of a reasonable monthly rental of $800, we note that Koch by sitting back and doing nothing had turned an obsolete crane into a gilt-edged investment. He did not have to worry about finding users, maintaining it, repairing it, moving it, insuring it. And he recovered, in 27 months, double his value and almost three times what he had invested in it. In this case letting the meter run was obviously good business.

■ We do not say that one tortiously deprived of his property should not be well recompensed, but we hold, in accordance with both common law principles and Puerto Rican decisions, that one "injured by the tort of another is not entitled to recover damages for such harm as he could have avoided by the use of due care * * *." Restatement of Torts § 918(1) (1939); Ortiz v. McCormick Steamship Co., 1940, 57 P.R.R. 551, 557.

The plight of a plaintiff in a case like this is difficult enough. With no evil motive and with no carelessness on his part, he finds himself, because of the wrongful act of a government official, saddled with a suit where the only issue is the extent of damages. To saddle him as well with the consequences of delay in disclosure on the part of the person whose property is attached is to misuse the protections of law. In this case appellee could have pointed out the error at any time after the attachment. It is hard for us to envisage that he would have had much difficulty in proving that a gray crane *sans* boom was not a yellow crane with boom. If persuasion proved unsuccessful, there were various legal alternatives available.

After trial and before judgment, appellee moved to reopen the proceedings for evidence of diligence on the part of appellee's prior attorney from the time of attachment in 1962 to the spring of 1964, on the ground that the issue of mitigation had not been raised by the pleadings, but had been injected by the court.[4] It seems to us that the issue was properly and inevitably raised. Even if we assumed, which we do not, that the issue of avoidable consequences was analogous to an affirmative defense, required to be pleaded in answer to the counterclaim,[5] we note that here the counterclaim itself forestalled such a response by perpetuating the illusion that the right crane had been attached.

■ Moreover, when it appeared from the evidence that the first revelation of mistaken identity was made almost two years after the attachment, it was natural to wonder what appellee had been doing during that period. When his testimony on direct afforded no explanation, it was inevitable that he would be questioned as to his actions and reasons. That it was the judge, not counsel, who opened up the issue is of no consequence. If appellee had been genuinely surprised, he could have objected at trial to the injection of the issue, or at least have sought a continuance to produce evidence of diligence. Failing that, he must be

---

bought the crane from Goldman. If so, he might have bought it from a thief. (As this case demonstrates, the possibility of crane-thievery is not unimaginably remote.)

4. In the course of examination of the appellee on this issue, the court properly observed, "If you have a prompt remedy to ameliorate your damages, you must exercise that, because you should not let that crane be there and rot, and after two or three years come in and ask for the damages."

5. McCormick, Damages § 33, at 130 (1939):
   "* * * The doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain items of loss may be excluded from consideration. Being thus a matter in 'mitigation', it need not be specifically pleaded at all by the defendant."

held to have impliedly consented to trial of the issue. Fed.R.Civ.P. 15(b); cf. Metropolitan Life Ins. Co. v. Fugate, 5 Cir., 1963, 313 F.2d 788.

Nevertheless, there is no finding of fact or conclusion of law addressed to the question whether the wrongful attachment was the sole proximate cause of appellee's lost rentals nor any finding that appellee used due care to avoid damages. That this was a question troubling the judge is indicated by at least two colloquies. But having properly inquired into the issue, he did not resolve it. Possibly it may be implied. If so, we think that it is reversible error on this record to have found that all lost rentals were solely attributable to appellant.

On the other hand, it would be equally erroneous to attribute all the damages to the appellee's delay. For while he should not profit from his silence during any period when giving voice to the wrong would have righted it, he cannot be treated as having waived his ultimate right to recover possession of his own property. Here the appellant was not lulled into thinking it had unrestricted dominion over the property; even under a valid attachment it had no more than the right to redeprive the appellee of possession pending the outcome of the suit.

Our reading of Puerto Rico law suggests that the attaching plaintiff may have an absolute duty to return the property upon dissolution of the attachment and an absolute liability for loss or damage during the period of custody.[6] See Balaguer v. District Court, 1942, 59 P.R. 645, 649; Avila v. Sons of Rafael Toro, Ltd., 1919, 27 P.R.R. 616.[7] But we need not decide that, for we are dealing here with an attempted attachment that was invalid from the beginning. The appellee's silence in no way validated the attachment; it merely disabled him from claiming damages for loss of possession during the period when he was silent. The appellant is in no better position than a negligent trespasser, who cannot absolve himself of his duty to restore by showing that he, too, has been dispossessed without fault of his own.

Therefore, we think that, from the time when Koch communicated the fact that the wrong crane had been taken to the time when it was finally returned, he is entitled to damages for the loss of possession. It makes no difference that Cohen's inability to return the crane during that time was caused by the intervening act of Rexach. In a sense it might be said that that, too, was an avoidable consequence, since it probably would not have happened if Koch had acted properly in the beginning. But we can assert no duty in Koch to guard against such a contingency, for while he may have lulled Cohen into thinking it had a valid attachment, he also had a right to expect Cohen to assume the responsibilities of an attaching creditor to preserve the property.

The judgment of the district court is affirmed with respect to liability, but the finding as to damages is vacated and the case remanded to the district court for a new trial on damages not inconsistent herewith.

---

6. P.R.Laws Ann. tit. 32, § 1078:
"An order prohibiting the alienating of personal property, and an attachment of the same, shall be effected by depositing the personal property in question with the court, or the person designated by it, under the responsibility of the plaintiff. * * * "

7. In *Avila*, the attaching officer had used the property for his own purposes and had damaged it. The attaching plaintiff claimed error in a finding that it had known of and consented to the use; but the court said the finding was irrelevant, since the plaintiff would be liable under the statute even in the absence of knowledge and consent.