Stephen Bruce **MURRAY**

v.

Joseph **BLATCHFORD,** Director of the Peace Corps, General Lloyd Wilson, Director of Rhode Island Selective Service, Local Board No. 3, Rhode Island Selective Service, John Mitchell, Attorney General of the United States, and Lincoln C. Almond, United States Attorney, District of Rhode Island.

**Civ. A. No. 4018.**

United States District Court
D. Rhode Island.

Dec. 24, 1969.

Marvin M. Karpatkin and Michael N. Pollet, Melvin L. Wulf, New York City, Milton Stanzler, Providence, R. I., for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen., Harland F. Leathers, Dept. of Justice, Washington, D. C., Lincoln C. Almond, U. S. Atty., for Dist. of Rhode Island, Providence, R. I., for defendants.

## OPINION

PETTINE, District Judge.

This is a civil action commenced by the plaintiff, a citizen of the United States and a resident of Rhode Island, who seeks declaratory, injunctive, and other relief against the named defendants. In a previous decision published *sub nom.* Murray v. Vaughn, 300 F.Supp. 688 (D. R.I.1969), this court set out the facts as alleged in the complaint, denied the various defendants' various motions to dismiss, treated the defendant Peace Corps Director's motion to dismiss the plaintiff's allegations of violations of due process as a motion for more definite statement, which was granted, permitted plaintiff to amend his complaint to state more definitely his due process claims, and declined to pass upon plaintiff's motion for preliminary injunction but ordered priority hearing of the permanent injunction suit and consolidation with it of the preliminary injunction suit.

The case was tried in September, 1969 and in the course of trial the court ruled upon various motions of the various parties. In particular, the court permitted broad-based discovery by the plaintiff of Selective Service and Peace Corps files,[1] denied the plaintiff's pretrial motion to dismiss the indictment in the criminal proceeding here sought to be enjoined,[2] denied the defendants' renewed pretrial motion to dismiss the second count of the plaintiff's complaint,[3]

1. No discovery orders were entered on the record, as virtually all of the discovery was graciously consented to by the United States Attorney during pre-trial proceedings.

2. This is the petitioner Murray's motion pursuant to Fed.R.Crim.P. 12(b) to dismiss the criminal indictment now pending against him for violation of the Selective Service laws. It has been the previous disposition of this court to try this civil action prior to the criminal action pending against Murray. I am not of a disposition to change my previous rulings. Furthermore, my ruling as to Count II of the plaintiff's complaint in this civil action is not sufficient, absent proof by Murray on the question of whether he presented a *prima facie* case to his Local Board, to require dismissal of the indictment as a matter of law. It is true that the previous opinion stated that the registrant "submitted a claim for conscientious objector status which claim satisfied the *prima facie* requirement." However, that ruling was made on the basis of a pre-trial motion to dismiss this civil action for failure to state a claim, with all inferences drawn favorably to the plaintiff. It remains for plaintiff to prove his claim on Count II, for this court to hear any evidence from Local Board No. 3 and for this court to review the file of Mr. Murray with respect to the reopening issue. If, by any chance, the court should actually arrive at trial of the criminal matter, it will again consider defendant's motion to dismiss the indictment in the same manner in which it considered a similar motion to dismiss in United States v. Seeley, 301 F.Supp. 811 (D.R.I.1969), unless the United States objects to that manner of treatment, as I suspect it will, because of the First Circuit's footnote statement in United States v. Ramos, 413 F.2d 743 at 744 n. 1 (1st Cir. 1969). In any case, we can cross that bridge if and when we come to it. The defendant's motion to dismiss the indictment is denied subject to his right to again raise it should the criminal action be ready for trial.

3. This is the motion of the United States pursuant to Fed.R.Civ.P. 12(b) (6) to dismiss Count II of the plaintiff's complaint for failure to state a claim upon

repeatedly denied hearsay objections by the defendants,[4] including one specific such objection involving a difficult evidentiary ruling under Fed.R.Civ.P. 43 and the Rhode Island Dead Man's statute,[5] denied defendants' motions for dismissal and judgment at the close of plaintiff's case,[6] and granted plaintiff's post-trial motion to amend his complaint to conform to the proof at trial concerning certain additional, allegedly lawless action by the defendant local board.[7] At the close of all the testimony, the court requested certain additional matters briefed, and the court then heard final arguments at which the plaintiff moved for judgment, and the defendant moved for dismissal or judgment. This decision constitutes the court's rulings on the defendants' final motions for dismissal and the parties' motions for judgment. Moreover, this decision constitutes the court's findings of fact and conclusions of law in compliance with Fed.R.Civ.P. 52 and 65.

## Factual Findings

Stephen Bruce Murray was born on November 7, 1941 in Hartford, Connecticut. At age eighteen he registered with Rhode Island Local Board No. 3 of the Selective Service System. During his college and post-graduate years, he received II-S student deferments, which terminated in May, 1965 upon his graduation from UCLA with a Masters in Music. Near the completion of his studies at UCLA, Murray inquired into possible Peace Corps service and was, in February, 1965, accepted into the Peace Corps for service in Chile. In June, 1965 he received a II-A occupational deferment from Local Board No. 3 and immediately commenced his training for Peace Corps service.

During this training period there was some discussion of Peace Corps policy concerning Volunteers' involvement in host country politics. Murray understood Peace Corps policy to forbid active involvement in the elective politics of the

which relief can be granted. It is the gist of the United States' position that plaintiff's Count II fails to allege an essential element—namely, that he stated in his Form 150 that his conscientious objector claim was a change in status which resulted from circumstances beyond his control. First, it is clear that the court believes it to be the law in the First Circuit and in this court that a crystallization of belief subsequent to the issuance of an order to report for induction is a circumstance over which the registrant has no control. See United States v. Stoppelman, 406 F.2d 127 at 131 n. 7 (1st Cir. 1969); United States v. Seeley, 301 F.Supp. 811 (D.R.I.1969). Second, I hold now as a matter of law that where a registrant submits a completed Form 150 containing a statement of conscientious objector status or where a registrant files a letter setting out a statement which can fairly be read by a reasonable man as a request for conscientious objector status, then the local board must reopen, unless it can set forth some reason other than timing alone for its refusal so to do. Obviously, the only means by which Local Board No. 3 can here state its reasons for refusal to reopen is by presentation of testimony by members of the Board or by presentation of the minutes of the Board coupled, per-

haps, with supporting testimony. In light of the fundamnetal importance of § 6(j) of the Act, I warn the Government, moreover, that a justification by the Board such as that set out in United States v. Hedges, 297 F.Supp. 946 at 952–953 (S.D.Iowa 1969) is not adequate in the eyes of *this* court. The Court in *Hedges* virtually requires a registrant to have the skills of a highly experienced Selective Service practitioner in filing his request for a reopening—I believe a more common-sense approach is appropriate to such requests.

4. As appears at various points of the transcript, the court based its rulings on its conclusion that the spoken statements sought to be excluded were not offered as proof of the truth of the matters therein stated but rather as legally operative facts.

5. See testimony of Stephen Bruce Murray, Tr. 93–104.

6. Fed.R.Civ.P. 41(b).

7. Fed.R.Civ.P. 15(b). The defense was in no way prejudiced by the amendment in that it was fully notified during trial and was permitted full scope to defend the additional claims of regulatory lawlessness. See Cohen Sons & Co. v. Koch, 376 F.2d 629 (1st Cir. 1967).

host country. At no time was there any policy forbidding Volunteers to write books or articles or to publish matter in host country newspapers. At no time was it ever discussed whether Volunteers could write to American or host country newspapers concerning civil liberties or other matters of public policy.

In late October, 1965 Murray took a week of home leave in Newport prior to his departure for Chile. At that time he made special inquiry of the clerk of Local Board No. 3, telling her of his term of service which would not terminate until December, 1967,[8] approximately one month after his twenty-sixth birthday. The clerk assured Murray that the draft board would not bother him, and that his deferment would be continued.[9] Moreover, Local Board No. 3 sent Murray a classification card indicating a II-A classification until June, 1967.[10]

After his home leave, Murray went to Chile where he engaged in service as a music teacher in the town of Concepion and as a member of the music faculty at the University of Concepion. The record stands in total testament to the distinguished, diplomatic, gentle and wholly professional quality of Murray's service to the people of Concepion—he was to them the very antithesis of the "ugly American."

In May of 1967, as the war in Vietnam continued to escalate, a group of Peace Corp Volunteers decided to circulate a petition among Volunteers in Latin America. The petition's ambition was a large signing by Latin American Volunteers and eventual publication in the *New York Times*, in the hope of bringing an early end to the mounting hostilities in Vietnam by manifesting strong support for such an end among the respectable and moderate members of the younger generation. The professional diplomatic community in both Washington and Santiago reacted swiftly and strongly to the petition: Ambassador Dungan, the then ambassador to Chile, informed the thirteen original initiators of the petition that attempted publication would result in their expulsion from Chile and return to the United States; [11] the subordinates in the Latin American section of the Peace Corps made known to Volunteers that any attempt to go to the media would result in expulsion. In May of 1967, Murray received in Concepion through the mail a copy of the petition circulated by the Volunteers in Santiago and a covering letter.[12] He signed the petition and returned it to Santiago. On June 1, 1967, through the agency of intermediate level Peace Corps personnel in Chile, a letter from the Director of the Peace Corps and the Ambassador to Chile was read to Volunteers in Concepion, including Murray.[13] That letter made clear that signers of the petition were in danger of "administrative discipline," including expulsion. Murray asked for a copy of the letter and was denied it. He then disputed its force and effect and argued with Peace Corps personnel concerning its wrongfulness as a matter of constitutional principle. On June 5, Murray wrote to the *New York Times*,[14] with copies to Peace Corps personnel, including Paul Bell, the Chilean Peace Corps Director,

---

8. The school year in Chile runs from March to December, the summer months being January and February. See plaintiff's Ex. 3(f). See Murray v. Vaughn, 300 F.Supp. 688 at 692 n. 2 (D.R.I. 1969).

9. See infra p. 16 and n. 26.

10. Occupational deferments run for a maximum of one year. 32 C.F.R. § 1622.21 (a). However, here the local board miscue is relevant only in so far as it adds a scintilla of evidence to the general allegations of regulatory incompetence.

11. Ambassador Dungan testified unequivocally that he thought the reason for Murray's expulsion to have been violation of his ad-hoc mandate and not the Peace Corps rule concerning involvement in host country politics. He testified further that in his opinion Murray had not interfered in any way with host country politics.

12. Plaintiff's Ex. 1.

13. Plaintiff's Ex. 20.

14. Plaintiff's Ex. 21.

and Jack Vaughn, the Director. His letter, which stated his reasons for disagreement with Peace Corps policy, was rejected. On June 7, 1967, Murray was classified I-A by Local Board No. 3 in Newport.

■ One theory of the plaintiff in this litigation has been the so-called "conspiracy theory," set out in the previous decision of this court. *Murray v. Vaughn*, 300 F.Supp. 688 at 693 n. 3 (D.R.I.1969)

> "Under this theory it is alleged that Murray's intention to state his mind on Peace Corps policy and on United States foreign policy became known to Peace Corps personnel who determined to and did, in fact, bring about his removal from the Peace Corps and who, also, informed his local Selective Service System agency of his termination and either hinted or indicated directly that Murray should be reclassified and that the local board then did reclassify Murray I-A."

The evidence fails to show any such conspiracy. While it is true that it was possible for Peace Corps personnel, prior to June 7th and after June 5th, to have informed by telecommunications the Selective Service System in Rhode Island of some possible retaliatory action against Murray by the Peace Corps for his dissent from Peace Corps policy and for his attempted publication in the *New York Times*, the record does not show any actualization of that possibility. It would require too great an inferential leap for this court to so find. Counsel for Murray has argued vigorously for the existence of the conspiracy. In particular emphasis has been placed upon (1) the availability to Chilean Peace Corps personnel of telecommunication access to the United States, (2) the testimony of Murray that his mother, now deceased, told him that Mrs. McBrier, the clerk of the local board, told her in a telephone conversation on Wednesday, June 21, 1967 that Murray was coming home from the Peace Corps, (3) the generally incompetent, illegal, and unexplained conduct of the local board with respect to Murray's case, including (a) the change of Murray's address to Newport in June, 1967 on his coversheet [15] so as to deprive him of the sixty-day appeal period for registrants in foreign countries,[16] (b) the existence of multiple "page 8's" [17] and the attempted doctoring of Murray's file by Rhode Island Selective Service personnel,[18] (c) the fact that Murray's letter of April, 1967 stating, in accordance with Mrs. McBrier's suggestion of October, 1965, that Murray would remain in the Peace Corps in Chile until December, 1967 has never appeared in Murray's file, and (d) the entire treatment of Murray's conscientious objector request. All of these factors, it is argued, can only be made consistent by the inference of conspiracy. The court cannot and will not attempt to make consistent the shoddy performance of Rhode Island Selective Service in this entire matter. There is, however, a distinction between fragmentary incompetence in the operation of a bureaucracy and planned and malicious abuse of office against a registrant. Whatever may have been the sins of Rhode Island Selective Service in this case, and the record shows them to have been many and varied, the gross sin of inter-governmental conspiracy with personnel of the Peace Corps to reclassify Murray, in retaliation for his letter to the *New York Times* or for his views regarding Peace Corps policy or the war in Vietnam, is not among them.

Subsequent to Murray's June 5 letter to the *New York Times* nothing transpired until June 16, 1967 when an article appeared in *El Sur*, the local Chilean newspaper in Concepion setting forth the Peace Corps policies regarding the rights of Volunteers to express themselves.[19]

---

15. Plaintiff's Ex. 3.

16. 32 C.F.R. § 1626.2(c) (4).

17. Plaintiff's Exs. 3(b), 3(c) and 7.

18. Plaintiff's Exs. 3(b), 3(c), 7, 8, 15, and 17.

19. Plaintiff's Exs. 22 and 23.

Murray responded to that article by translating into Spanish his letter of June 5, 1967 to the *New York Times* and submitting that letter to *El Sur*, in which it was published on June 17, 1967.[20] On Friday afternoon, June 16, 1967, Mr. Nate Witham, the newly appointed Peace Corps Area Representative for the area encompassing Concepion, arrived in Concepion from Santiago, where he had conferred with Paul Bell, the Chile Director of the Peace Corps and one of the recipients of Murray's letter of June 5, 1967 to the *New York Times*. Witham had familiarized himself with Murray's letter and was aware of the Peace Corps article which had appeared in *El Sur* on that day. Murray informed Witham of his intention to publish in *El Sur* and, although Witham sought to dissuade Murray on the propriety of his position, he did not seek to forbid the *El Sur* publication. On Saturday June 17, 1967, after the *El Sur* publication, Witham again met with Murray and showed to him Jack Vaughn's letter of June 7, 1967,[21] to one of the originators of the petition, which amplified the Peace Corps policy directives previously issued and made known to Murray on June 1, 1967. Murray was not persuaded. On the same day, Witham had been in touch with Paul Bell in Santiago concerning Murray. Nothing further transpired on Saturday or Sunday. On Monday, June 19, 1967, Witham informed Murray that he had to go to Washington immediately for consultation, but that he was not terminated. The Peace Corps informed no one at the University that it was interrupting Murray's service, and on the same day the music faculty there condemned the action of the Peace Corps and offered Murray private employment in continuation of his teaching work. On Monday afternoon Murray spoke with Paul Bell by telephone and Bell specifically confirmed

that Murray was returning to Washington only for consultation and not for termination. Murray travelled all day on Tuesday, June 20, 1967 by bus from Concepion to Santiago, arriving there by six-thirty in the evening. After some discussion with Bell, in which Bell specifically disavowed that Murray was to be terminated, Murray was driven to the airport for the flight to Washington. At no time did Bell inform Murray that he had prepared a "case summary"[22] on the previous day indicating that Murray was being sent to Washington not for consultation at all, but for termination and that he recommended termination as Peace Corps Director for Chile. Upon arrival in Washington on Wednesday, June 21, 1967, Murray was met by Chuck Lewis, the Chile desk officer at the Peace Corps in Washington who told him that he was not going back to Chile and that he was to be terminated. When Murray went to Peace Corps Headquarters in Washington, he met with Mary Ellen Case who was to coordinate his activities at Peace Corps Headquarters. She too told him he was to be terminated, but upon Murray's objections it was agreed that termination would await the results of several exit interviews. Those interviews were with members of the staff of Peace Corps Headquarters in Washington and took place over the course of a week from June 21, 1967 until June 28, 1967. The staff personnel prepared written records of their discussions with Murray, which were submitted to the Director. In culmination of the process to which Murray was subjected, he interviewed with Director Vaughn on June 27, 1967. Murray was not informed that Interim Policy Directive 3.1 existed,[23] nor that Paul Bell had submitted a case summary recommending termination, nor that exit interview reports and recommendations had been given to Vaughn supporting termina-

---

20. Plaintiff's Ex. 22. There were two immaterial changes in the letter to *El Sur*, one necessitated by spacing problems in the newspaper and the other necessitated by a change in circumstances.

21. Plaintiff's Ex. 24.

22. Plaintiff's Ex. 12.

23. Defendants' Ex. D.

tion,[24] nor that he had any opportunity whatsoever to rebut any of the matter submitted against him. Moreover, he was not advised that he could seek legal counsel, that he was entitled to a transcript of the record pyramiding against him, that he could respond to allegations of fact or theory made against him, that some independent review could be made of his termination, that he had a right to confront any persons who stood strongly against him, or that he had a right to contest by cross-examination certain allegations made about him. Moreover, the summary sheet prepared by Mary Ellen Case with respect to the completion of the requirements of Interim Policy Directive 3.1 was falsely completed as to whether Murray saw and initialed Bell's summary and as to any one-paragraph summary or any answer by Murray. See Plaintiff's Ex. 30. At the close of the interview, Murray was informed by Vaughn that he was terminated and one day later he received his letter of termination.

 Murray has alleged that but for his termination from the Peace Corps he would have reached his twenty-sixth birthday in November, 1967 and would not have been ordered to report for induction. Murray v. Vaughn, 300 F. Supp. 688 at 693 n. 3 (D.R.I.1969):

" * * * had Murray continued in Peace Corps service his local board either would not have reclassified him I-A or would have entertained and granted a *pro forma* request by him to be returned to II-A status. Hence, it is concluded, 'but for' the action of the Peace Corps, Murray would have retained his II-A status, would have passed his twenty-sixth birthday, and would not have been ordered to report for induction."

Proof of this allegation is essential to Murray's case, and this court finds that Murray has so proved by a clear preponderance of the evidence. Under the statutory and regulatory law in effect at the time of action involved in this litigation, Murray would not have been subject to induction unless an order to report had been issued prior to November 7, 1967, his twenty-sixth birthdate. Moreover, the normal expiration date of Murray's term was to have been December, 1967, the end of the Chilean school year, and one month after Murray's twenty-sixth birthday. The testimony of Mr. Eric Stephenson, General Counsel to the Peace Corps at the time of Murray's service, establishes that no Volunteer, such as Murray, who had received an occupational deferment upon entering the Peace Corps, had to terminate service with the Peace Corps because of the issuance of an induction order during his Peace Corps term of service. That testimony is buttressed by that of Daniel Buck, the Selective Service Liaison Officer of the Peace Corps, which shows that out of the more than 20,000 Volunteers who served between 1961 and 1969, only eight entered Peace Corps service with an occupational deferment and had to terminate Peace Corps service before the end of their term due to the issuance of an order to report for induction. Further, no Volunteer had so to terminate service in the Peace Corps prior to the latter half of 1967. And, even thereafter, the number of actual terminations was minimal. The testimony of Buck shows that not one of the several Peace Corps Volunteers registered with Rhode Island local boards who received occupational deferments upon entry into the Peace Corps ever had to terminate service due to the issuance of an induction order prior to termination of Peace Corps service. The testimony of Stephenson and Buck, which was testimony of a combined expert and statistical-projective type, in and of itself shows that it was clearly more probable than not that Bruce Murray would have been *pro forma* returned to II-A classification by his local board in summer of 1967 had he not been terminated from the Peace

---

24. Plaintiff's Ex. 25. Defendants' Exs. B and C.

Corps.[25] That clear probability is heightened to near certainty by the attitude taken by Mrs. McBrier in October, 1965 when Murray told her that his term of service would extend beyond his twenty-sixth birthday to December, 1967 and she told him "not to worry" and merely to *pro-forma* inform the local board prior to June, 1967.[26] Of still further significance with respect to the issue of what the local board would have done is the testimony of the single member of the local board called to testify in this litigation, Mr. Walter G. Dyer. Under exceedingly hostile cross-examination by counsel for plaintiff, Dyer admitted that the fact of whether or not Murray was in the Peace Corps in summer of 1967 was central to the board's consideration of Murray's request for occupational deferment in July and August of 1967.[27] It must be conceded that Dyer subsequently backed off that judgment, but in this court's eyes, the admission is ineradicable and I reject the later attempt to explain it away, an attempt made, I believe, only when the realization of the significance of the admission dawned upon the witness.[28] For all of these reasons, I conclude that had Murray not been terminated from the Peace Corps, he would have received, upon request, a II-A occupational deferment for the remainder of his Peace Corps service.[29]

25. It should be noted that the absence of any direct proof from the local board concerning what it might have done is attributable to the presence in this case of somewhat intense hostility. A great amount of the plaintiff's proof was developed by the calling of hostile witnesses who were then cross-examined.

26. See supra p. 5 and n. 9. The comments of the clerk do not, in this context, bind the local board. However, they are relevant in that they indicate the attitude of a person who is in an excellent position to know the then prevailing policy and practice of the board regarding Peace Corps deferments.

27. Under cross-examination by counsel for plaintiff, Mr. Dyer stated, in pertinent part, as follows:
"Q. Isn't it true, Mr. Dyer, that the Board was told by Mr. Murray that he wanted an occupational deferment to return to Chile to teach music? Is that what Mr. Murray told the Board?
A. I think that is essentially correct.
Q. And the Board told Mr. Murray that under no circumstances could he get a deferment to teach music in Chile?
A. That is not so.
Q. The board did not tell him that?
A. That is not so.
Q. The Board said, 'Bring in documentation in support of your request?'
A. That is correct.
Q. And he did bring in documentation in support of his request?
A. I'll have to qualify the answer to that; I think those of us that were awaiting his three letters that he presented to us still expected he would be under the aegis of the Peace Corps and they were not.

Q. Now, if there had been documentation from the Peace Corps to the effect that Mr. Murray had a responsible position at the music school at the University of Concepion, that his work was highly regarded by the Ministry of Education and by the leading musical authorities of the Republic of Chile, and that he was doing a great deal to help promote and support Chilean and American relations as well as the cultural life of America and Latin America together, now, under those circumstances would the Board have granted him an occupational deferment?
A. Speaking purely for myself again I would have given the whole matter a great deal more consideration than I did having read those three letters.
Q. I see—so then if he had been supported in his request by the Peace Corps it might have made some difference?
A. It's hypothetical, of course, but it might have, yes. I would like to add in my answer to that, that having met thousands of Peace Corps workers all over the world, I have rarely seen anybody whose Peace Corps work—who had a tour of duty of more than two years."

28. Moreover, the witness later admitted in general terms the significance of Peace Corps service to his own decision regarding occupational deferments.

29. See supra n. 25. There has been an allegation of punitiveness on the part of the local board with respect to Murray's requests for reopening on both occupational and conscientious objector grounds. I am unable to find such an attitude on this record. However, feelings ran high throughout the trial of this case and the

Even if Murray were maintained in I-A classification, he could not have been issued an order to report for induction prior to his twenty-sixth birthday, if he had been retained in the Peace Corps. Murray would have been able to request a personal appearance within thirty days following his I-A classification on June 7, 1967. 32 C.F.R. § 1624.1. After the processing of his classification request at personal appearance, 32 C.F.R. § 1624.2, and if he were reclassified I-A, Murray would have had the right to request an appeal within sixty days following reclassification. 32 C.F.R. § 1626.2 (c) (4). The local board would then have had to prepare an appeal record and to forward his file, 32 C.F.R. § 1626.13, for docketing, 32 C.F.R. § 1626.23, and ultimate decision. In the absence of a specific directive from the Director of Selective Service, the Rhode Island Appeal Board would have been compelled to consider Murray's appeal, without regard to his fast-approaching birthday, in the order in which it was received. 32 C.F.R. § 1626.24(a).[30] If the Rhode Island Appeal Board had denied Murray's request for a II-A classification with a single dissenting vote, there would have been an absolute right to request a Presidential Appeal within thirty days following the reclassification by the Appeal Board. Moreover, even if the Appeal Board unanimously denied his classification request, the testimony of Stephenson and Buck establishes that the Peace Corps would, as a matter of its inter-agency relations with Selective Service, have been able to secure a Presidential Appeal for Murray. The time limits required for the pursuit of the previously discussed regulatory procedures, taken together with the normal time required for Selective Service decision-making, and including the time it normally takes for mail to be received between the United States and Chile, make it inevitable that Murray would have reached his twenty-sixth birthday prior to the issuance of an induction order, even if he had been maintained in a I-A classification as of June 7, 1967.

Upon his expulsion from the Peace Corps, Murray returned to Newport in late June of 1967. On July 11, 1967 he prepared a typed request for II-A occupational deferment in order to continue his teaching work at the University of Concepion, where he had been offered continuing employment notwithstanding his Peace Corps termination.[31] On July 12, 1967 Murray went to his local board where he submitted his letter and also appeared personally before the board. The board voted 3-0 to retain him in I-A classification but asked him to get an official employment offer from the University. On July 27, 1967 Murray submitted to the local board the University's official employment offer and an additional written request for re-opening and occupational deferment.[32] The local board met on August 9, 1967. The court finds, however, that the board did not vote on Murray's requested re-opening. That one of the several versions of the minutes of local board action which tends to be most beneficial to the local board fails to record that any vote was taken concerning re-opening on August 9, 1967.[33] The minutes of the August 9, 1967 local board meeting[34] fail to show that Murray's case was voted upon by the board. The testimony of Mr. Dyer, which was offered to rebut the plaintiff's

psychological effect of this vigorous adversarial confrontation made it difficult for the court to gauge certain of the testimony. It would not be unfair to say that the attitude of those Selective Service personnel who testified was not entirely impartial.

30. But see State Director Advice No. 764 (Nov. 27, 1968) which changes the present policy from the policy in effect when Murray's case was within the Selective Service structure. 1 SSLR 42.

31. Plaintiff's Exs. 3(k) and 3(l). See testimony of Stephen Bruce Murray, Tr. 81–82.

32. Plaintiff's Exs. 3(k), 3(l), 3(p), and 3(q).

33. Plaintiff's Ex. 3(c).

34. Defendants' Exs. F and H.

claim of regulatory lawlessness with respect to the August 9, 1967 meeting fails so to do. Dyer could not recall a vote having been taken on this matter. Indeed, Dyer specifically stated that no vote was taken on the question of whether or not to re-open. The absence of a vote on August 9, 1967 is buttressed by the minutes of the October 10, 1967 meeting of the local board, which reveal the board's consideration of the plaintiff's then re-opening claim and its recordation of its vote on that re-opening claim.[35] It is clear, therefore, that the board followed a practice of recording votes on board action not to re-open, a practice the absence of which as to August 9, 1967 shows that no such vote was taken.[36]

On August 10, 1967 the board sent notice to Murray concerning its consideration of his occupational re-opening claim.[37] The court finds the notice to be an inaccurate reflection, although not a deliberate falsification, of what actually happened at the board meeting on August 9, 1967. On the same day, August 10, 1967, the Selective Service file of Murray was forwarded to Rhode Island Selective Service Headquarters for appeal to the Rhode Island State Appeal Board. On September 12, 1967 Murray was informed by his local board that the Rhode Island Appeal Board had consid-

ered and denied his request for occupational deferment. That same day he received also from his local board, but under separate cover, an order to report for induction on October 4, 1967.[38]

From the date of his return to Newport in late June, 1967 until late September, 1967, Murray had been in discussion with various persons in Selective Service and otherwise concerning his attitudes and beliefs with respect to war. As a factual matter, his conscientious objection to all war did not mature until after the September 12, 1967 issuance of the order to report for induction on October 4, 1967. On September 28, 1967 with the assistance of his counsel, Murray completed a Form 150 conscientious objector application, which he submitted to Local Board No. 3 on September 29, 1967.[39] On the same day, the clerk of the local board consulted with Selective Service State Headquarters, filled out a report of oral information,[40] and forwarded the registrant's file to state headquarters. There, the file was reviewed by Lt. Col. Henry Kelly, who completed a memorandum on October 2, 1967[41] which memorandum was returned with the file to the board on or about October 3, 1967. Murray at no time received notice of the Kelly memorandum. On October 3, 1967 Murray's induction was postponed until October 16,

---

35. Plaintiff's Ex. 11.

36. The court is aware that 32 C.F.R. § 1625.4 does not require recordation of the vote of the local board on a decision not to reopen.

37. Plaintiff's Ex. 3(m).

38. There is no evidence of record in this case concerning the date, on which Local Board No. 3 received back from Rhode Island State Selective Service the results of Murray's appeal, as compared with the date on which the local board notified Murray of the Appeal Board decision and the order to report for induction. However, a showing of such substantial delay in notifying a registrant of the unfavorable outcome of his appeal as to permit a simultaneous mailing of an order to report for induction raises grave procedural problems. See 32 C.F.R. §§

1626.27(b) and 1626.31(a). There is an important distinction between pre-induction-notice and post-induction-notice re-opening requests. Just as an induction notice can catalyze the crystallization of religious experience, so too can notice of unfavorable Appeal Board disposition be so immediate a step toward the awesome and anxiety-producing event of induction *as to prompt a registrant to that* highly emotive self-scrutiny which often results in a change of spirit. Accordingly, the court suggests that special care be given to the task of immediate notification to registrants of Appeal Board results.

39. Plaintiff's Ex. 3(g).

40. Plaintiff's Ex. 3(d).

41. Plaintiff's Ex. 16.

1967. The local board met on October 10, 1967, considered Murray's Form 150, previous information in Murray's file, and the memorandum of Col. Kelly and voted to refuse to reopen. Sometime after October 10, 1967 the Kelly memorandum was removed from Murray's file by Selective Service personnel at either the local board or State Headquarters. On October 10, 1967, notification of the refusal to reopen was sent to Murray.[42] On October 16, 1967 Murray refused to submit to induction.[43] On January 24, 1968 Murray was indicted in the United States District Court for refusal to submit to induction. His criminal case has not yet come to trial.

Since September, 1967 until the time of this trial, Murray has been denied job opportunities in the public schools of Rhode Island, which opportunities clearly exceed $10,000 in value, even when diminished by his actual earnings during this period. The exclusive reasons for the denial of job opportunities have been either the pendency of this litigation or Murray's expulsion from the Peace Corps.[44]

### Legal Discussion and Conclusions
### The First Amendment

■ For the reasons stated in Murray v. Vaughn, 300 F.Supp. 688 at 703–705 (D.R.I.1969), I hold that the action of the Peace Corps in expelling Murray violated the First Amendment. Neither the holding nor the rationale of Goldwasser v. Brown, 417 F.2d 1169 (D.C. Cir. Sept. 17, 1969) supports a contrary result. In *Goldwasser* a teacher was discharged from civilian employment with the Air Force as a language instructor whose job was to teach basic English to foreign military officers in this country as guests of the U.S. Government. The basis for the discharge was Goldwasser's use of the classroom to state his views regarding the war in Vietnam and anti-semitism in America. In discussing the

Supreme Court's decision in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) as applied to Goldwasser's situation, the Circuit Court said:

" * * * we note that the public school teacher in Pickering was not fired for what he said *in* class, but for writing a letter to a newspaper critical of the policies espoused by the School Board and School Superintendent in the allocation of school funds as between different educational programs. The efficiency with which Pickering taught geography or algebra to the pupils immediately in front of him was not affected by his extra-curricular expressions."

Similarly in this case there is no claim that Murray's function as a member of the Peace Corps was diminished in efficiency by virtue of the publication in either the *New York Times* or *El Sur*. And this court has rejected the government's argument regarding the supposed interference in host country politics. Hence, *Goldwasser*, by its very language supports Murray's position. Accordingly, this court reaffirms its earlier holding that

" * * * Murray spoke about matters of vital interest to him as a human being, a United States citizen, and a Peace Corps Volunteer. Any inhibition on speech so far removed from the government interest alleged to support it must fall."

### Termination Procedure

■ In its previous decision this court did not decide the various due process questions raised by the plaintiff's complaint. It is, further, indisputable that the federal courts in particular are examining carefully various state or federal "systems" which regulate varying interests of the citizenry. For example, the juvenile justice system has been subjected to constitutional scrutiny

---

42. Plaintiff's Ex. 3(n).

43. Plaintiff's Ex. 3(o).

44. Testimony of Stephen Bruce Murray, Tr. 164–174 Murray v. Vaughn, 300 F. Supp. 688, at 694–696 (D.R.I.1969).

and found wanting. See In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). So too has the Selective Service System, see, e. g., Oestereich v. Selective Service Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); United States v. Weller (N.D.Calif. Sept. 19, 1969), the various college and university disciplinary bodies, see, e. g., Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wis.1968); General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (W.D.Mo. 1968), and the state and federal prisons and other institutions. See, e. g., Cupp v. Swenson, 288 F.Supp. 1 (W.D.Mo. 1968); Holt v. Sarver, 300 F.Supp. 825 (D.Ark.1969); Shone v. Maine, 406 F.2d 844 (1st Cir. 1969), dismissed as moot, 396 U.S. 6, 90 S.Ct. 25, 24 L.Ed.2d 6 (Oct. 13, 1969). The minima required by due process in the context of a termination from Peace Corps service has never been decided. Because such a decision would involve more than just the Peace Corps, would require a searching analysis of various agency procedures, and would reach to the frontiers of constitutional development, I am reluctant to carry it out at the trial level, in a case such as the instant one where it is clear that the involved agency has violated its own regulatory framework for termination. See Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

Interim Policy Directive 3.1 of the Peace Corps[45] governs "separation of PCVs prior to completion of service." The directive contemplates terminations which " * * * will normally begin in the field * * *" and " * * * when other action is warranted, the Volunteer's return to Washington will be ordered * * *." The Peace Corps has consistently interpreted this directive to give to the Volunteer the option to terminate in the field if he so chooses. Accordingly, it should be implied from the directive and the regulatory practice that the Volunteer be informed of his in-the-field termination right. Murray made clear that he would have preferred to terminate and remain in Chile at his job had Paul Bell told him that he had that right. Hence, the directive was violated in this respect.

If the Regional Director proposes to the Peace Corps that the Volunteer's service be terminated, he must discuss this matter with the Volunteer. Patently, discussion requires some mention of termination. Murray discussed this matter with both Nate Witham and Paul Bell but the fact of possible termination was actively concealed from him. This too violates the directive.

If the Regional Director proposes termination, he must prepare and forward to Washington a "written recommendation with a complete report of the relevant facts." Paul Bell's case summary meets that requirement.[46] However, the directive further requires the Regional Director to prepare and show to the Volunteer and forward to Washington " * * one paragraph statement of the reasons for the proposed * * * termination." This was not done in Murray's case. Finally, the directive permits the Volunteer to include any statement he chooses in the material forwarded to Washington. Because Murray was not informed of this right, he did not make such a statement.

The directive sets out further provisions for the procedure once the Volunteer arrives in Washington. With certain notable exceptions the Washington procedures were in substantial compliance with the directive. However, Murray was not permitted the opportunity to prepare his own statement for consideration prior to termination by the Di-

45. Defendants' Ex. D.

46. Plaintiff's Ex. 12.

rector. Rather, his statement [47] was entered on his record after termination. Finally, the checklist of termination procedure [48] in Murray's case was falsely filled out with respect to its items 2 and 3 in violation of the obvious purpose of the checklist and the directive.

It might be supposed that the violations of regulatory procedure in Murray's case were mere peccadillos. The court does not agree with any such supposition, for the fundamental wrong which weaves itself throughout the whole fabric of Murray's termination was that there was no opportunity for vigorous and fully informed adversarial confrontation on the issues raised by Murray. Had such a confrontation emerged within the Peace Corps as it has now in the courts, this entire litigation might have been avoided.

### Selective Service Procedure—The August 9 Meeting

 The court has found as fact that the local board met but did not vote upon and did not record any vote of Murray's July 27, 1967 request for reopening on occupational grounds. Clearly, the board has no obligation to record its vote on a refusal to reopen. 32 C.F.R. § 1625.4. However, the board has an absolute obligation which goes to the very essence of its function to vote upon classification matters, including a request for reopening on occupational grounds. 32 C.F.R. § 1604.52a(d). In United States v. Walsh, 279 F.Supp. 115 (D.Mass.1968) the registrant's request for reopening was refused by a local board which never met to, among other things, vote as a board on the request. The District Court there held that disregard of the regulatory requirement to vote constituted arbitrary action, a violation of law, and of due process of law. In United States v. Prescott, 301 F. Supp. 1116 (D.N.H.1969) the registrant filed with his local board certain letters regarding a reopening for an occupational deferment. The facts there are similar to the instant facts, in that the registrant was a recently returned Peace Corps Volunteer who had received possible employment with International Voluntary Services, Inc. and had submitted some evidence of such employment to his board. The court there stated at pp. 1121–1122:

"The defendant first cites the failure of the local board to consider his status in light of new facts which were not formerly considered when he was classified I–A. In particular, the defendant points to two letters received by the local board from him on July 29 and August 19, 1968. In the letter of July 29th, he stated that he was being considered for a position with IVS. Gov't Exh. No. 1, Doc. 49. The August 15th letter explained that his consideration by IVS for a position with them was being delayed because one of the more important required reference forms had not yet been returned from the Peace Corps. Gov't Exh. No. 1, Doc. 59. The defendant's Selective Service file is void of any action by Local Board No. 1 on these two letters. The evidence indicates that these letters were never considered at any formal meeting of the local board. Admittedly, these were letters from the registrant indicating only the fact that he was being considered for a position with IVS. And testimony at the trial and a letter dated December 10, 1968, in defendant's Exhibit No. E, indicates that the registrant was not in fact accepted by IVS until December 10, 1968, which was nearly three months after the effective date of the order to report for induction.

"The issues which the defendant raises in connection with these letters are two: (a) whether the letters did in fact indicate status-changing facts; and (b) whether or not the local board was required by statute and the regulations to formally consider these letters.

"(4) it seems clear that the letters contained information that might indicate a change in classfication. The regu-

---

47. Defendants' Ex. G. 48. Plaintiff's Ex. 30.

lations require each classified registrant to report to his local board, in writing, any fact that might result in his being placed in a different classification. 32 C.F.R. § 1625.1(b). And,

The local board may reopen and consider anew the classification of a registrant (a) upon the written request of the registrant, * * * if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification; * * *. 32 C.F.R. § 1625.2. ('When registrant's classification *may* be reopened and considered anew.') (Emphasis added.)

"Immediately thereafter, § 1625.3 directs 'When registrant's classification *shall* be reopened and considered anew.' (Emphasis added.) Because section 1625.2 speaks in terms of 'may,' whereas 1625.3 uses the directive language 'shall,' the Court is of the opinion that 1625.2 is discretionary in application by the board. But, even though the board has discretion as to whether or not a registrant's classification should be reopened and considered anew, this does not negate the board's duty to at least consider 'any fact that might result in the registrant being placed in a *different* classification.' Consideration by the board will many times result in the preliminary determination that there is no reason for a reopening and reconsideration of the registrant's qualification, but such determination cannot be made without united consideration of the new facts by the board.

"(5) The Court can only assume that no such consideration was made by the defendant's local board of the two letters as there is no mention of such action in the minutes of the meetings of the board for the months of July, August, or September of 1968.

"There is a failure of due process by the local board if it fails to consider 'any fact that might result in the registrant being placed in a different classifica-

tion.' This does not mean that the board must decide that the registrant's classification should be reopened and considered anew. It does mean that it must at least consider any facts that might lead to such action."

The court accordingly holds that Local Board No. 3 violated the regulations in that it failed to vote at its meeting on August 9, 1967 upon Murray's request for reopening of July 27, 1967.

*Selective Service Procedure—The Kelly Memorandum*

■■■■■ The court has found as fact that the memorandum of Col. Kelly was considered by the board in reaching its decision not to reopen Murray's classification on October 10, 1967, and was thereafter removed by Selective Service personnel from Murray's file. While such consideration by the board raises questions regarding the issue of Murray's post-induction notice conscientious objector claim, hereinafter to be discussed, it also constitutes an independent act of procedural lawlessness. There is no Selective Service regulation which requires that adverse information regarding a registrant's case which is considered by a local board or appeal board must be made known to the registrant. Nor do the Selective Service regulations require that the registrant be permitted to rebut such information. However, "inherent in the most narrow view of due process is the right to know of adverse evidence and the opportunity to rebut its truth and relevance." United States v. Owen, 415 F.2d 383 (8th Cir. Aug. 29, 1969). The right has been recognized in the Selective Service context where a registrant's administrative appellate due process rights have been held to have been violated by virtue of adverse statements put in his file by government officials and not either known to him or able to be rebutted by him. See United States v. Owen, 415 F.2d 383 (8th Cir. Aug. 29, 1969), Bengoechea v. Micheli, 295 F.Supp. 257 (D. P.R.1969), Wiener v. Local Board No. 4, 302 F.Supp. 266 (D.Del.1969). Without

a lengthy reiteration of the particular facts of each of the cited cases, the court holds that Murray's due process rights were violated by the local board's consideration of Col. Kelly's memorandum and its concomitant failure to advise Murray of the memorandum or to permit him to rebut the memorandum.[49] I further hold that the subsequent removal of the Kelly memorandum was violative of 32 C.F.R. § 1621.8, which requires that "(e)very paper pertaining to the registrant * * * shall be filed in his Cover Sheet * * *."

### Selective Service Procedure—Post-Induction Notice Conscientious Objector Reopening

 The proper treatment of post-induction notice conscientious objector requests for reopening has been a subject of considerable concern in the federal courts, the Selective Service System, the various organizations representing conscientious objectors, and among counsel who specialize in Selective Service law. This court has previously discussed the question of reopening upon a conscientious objector request in a context involving a registrant with serious intellectual limitations whose beliefs matured before but whose claim was not raised until after the issuance of an order to report for induction. United States v. Seeley, 301 F.Supp. 811 (D.R.I.1969). The instant case is different in that it involves post-induction notice maturation of conscientious objection in a registrant with better than normal intellectual functioning. In Murray v. Vaughn, 300 F.Supp. 688 at 707-708 (D.R.I.1969), the court set out the law in this Circuit for such a claim. Furthermore, at the beginning of trial the court amplified somewhat its views on one particular facet of the law. See note 2, *supra*. Because of the confusion in this area, because argument in full

and briefs have been submitted on this question, and in order to suggest a uniform rule, the court will discuss in full what it deems to be the law of post-induction notice conscientious objector reopening requests. First, 32 C.F.R. § 1625.2 is a legitimate assertion of regulatory law-making power in so far as it requires claims to be raised as soon as they have matured. United States v. Gearey, 368 F.2d 144 (2nd Cir. 1966). Second, the maturation of conscientious objection to participation in war in any form is a circumstance over which the registrant has no control. United States v. Stoppelman, 406 F.2d 127 at 131 n. 7 (1st Cir. 1969). Third, the discretion vested in local boards with respect to reopening is rendered mandatory by 50 U.S.C.App. § 456(j) and possibly by the First Amendment to the Constitution, where the reopening request is based upon maturation of conscientious objection to war in any form after the issuance of an order to report for induction. Murray v. Vaughn, 300 F.Supp. 688 at 707-708 (D.R.I.1969). Fourth, the process for the local board upon such a request is a three-fold one: (1) to determine at the threshold the *kind* of claim, that is, whether the claim is one of post-induction notice maturation of conscientious objection, as distinguished from, say, an occupational or hardship claim; (2) to determine whether the claim has matured after the issuance of the order to report; (3) to determine whether the registrant has made a *prima facie* case for conscientious objector status.

 The first step is preliminary in nature and involves really a categorization of the registrant's substantive claim. Probably, it should be carried out so as to construe the claim most favorably to the registrant. The second step —the determination of maturation—is important and the local boards may both

---

49. Notice and the opportunity to rebut would have been most helpful to both the registrant and the local board in this instance, in that the Kelly Memorandum is replete with factual and legal errors, the most important of which is its failure to recognize the broadened definition of religion established by United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

search the registrant's file for indications of maturation prior to issuance and may hold discretionary interviews to discuss the maturation with the registrant. However, it should be made very clear that the registrant's own claim of maturation after issuance, whether in precise language or not, whether on a Form 150 or not, will carry controlling weight unless the board can find a genuine prior maturation. Although they are not required to do so, boards would be well served to state whatever facts they rely upon to reach a conclusion of prior maturation. The third step—the determination of whether or not a *prima facie* case has been presented—is the most troublesome one, for here the local boards may run four-square into the problem of determining the merits of the registrant's claim under the guise of determining whether his claim is *prima facie* sufficient. This would constitute a de facto reopening. Pursuant to 32 C.F.R. § 1625.4 the board must accept the statement of the registrant in requesting reopening as true. Hence, the local board's purview as to the *prima facie* presentation of claim on a request for reopening is limited to the information submitted in the request. If the local board goes beyond the information set forth in the registrant's statement, it is violating 32 C.F.R. § 1625.4 and depriving the registrant of his rights to a personal appearance before the board and to an appeal. While the local boards may hold a discretionary interview on the issue of maturation, they take serious risks if they hold such interviews on the issue of *prima facie* presentation of claim. One court has held that the mere holding of a discretionary interview constitutes a de facto reopening. United States v. Westphal, 304 F.Supp. 951 (D.S.D. October 20, 1969). This court, however, thinks that the critical issue is whether, at such a discretionary interview, the board makes any inquiry *whatsoever* into the merits of the registrant's claim. See Miller v. United States, 388 F.2d 973 (9th Cir. 1967); United States v. Baker,

1 SSLR 3017 (E.D.N.Y.1968). If it does, then a reopening must be deemed to have occurred, entitling the registrant to his personal appearance and administrative appellate rights.

■ In the instant case, the board abused the regulatory strictures imposed upon it in several important respects. First, the board looked to the merits in basing its refusal to reopen in part on Col. Kelly's memorandum, which, in content, flew in the face of Murray's completed Form 150, and in part upon other previous data in Murray's file. Hence, by refusing to reopen after a determination on the merits, the board denied Murray his rights of personal appearance and appeal. See Miller v. United States, 388 F.2d 973 (9th Cir. 1967); United States v. Burlich, 257 F.Supp. 906 (S.D.N.Y.1966). Second, any claim by the board that reopening was denied on the ground that maturation occurred prior to the issuance of the order to report is wholly arbitrary: Murray's Form 150 stated clearly a post-induction notice maturation of his conscientious objection, and there is no scintilla of evidence within his file which contradicts his statement.

"I believe this would be the right place to explain why I have never filed as a conscientious objector before. Up to this summer, I have always had a deferment, II–S as a student and II–A as a Peace Corps Volunteer, and I was content with them. Naturally, my beliefs have not matured overnight, but now, faced with a notice to report for induction into the army, I have been forced to give more thought and attention to the idea of conscientious objection, and my inchoate feelings about war, which have only become crystallized within the last few days. I suppose I have always had anti-war feelings but I have always been 'safe' with deferments and had no need to concentrate my thoughts specifically upon the question of conscientious objection. But when ordered to report for induction and confronted with the

concrete prospect of going into the army and having to take part in war, I focused my attention on the central question of conscientious objection and came to the conclusion that I was opposed to killing and war in any form."

Third, patently Murray's conscientious objector request for reopening constitutes a *prima facie* case. That his objection is religiously grounded, in both the statutory, 50 U.S.C. App. § 456(j), see United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and constitutional, see United States v. Sisson, 297 F.Supp. 902 (D.Mass.1969), senses is clear from his statement.

"Regarding my belief in a Supreme Being or God, I do not accept completely the Judeo-Christian concept of God. Nor can I accept all the doctrines and beliefs that go with the worship of God as set forth in any given religion. What I do accept is a Supreme Being who is not affiliated with any religion but who has endowed each one of us with a small spark or substance of Himself, and who has given us all the ability to discover this substance through the conduct of our lives, our relationships with others, and through meditation. My belief follows somewhat the idea of the Hindus who call this divine substance the Atman and claim that when a person knows the Atman he knows truth, about himself, his relation to the universe, and God. This relationship of God to man also exists in Christianity, where we have God the Father, and all of humankind, the Son of God."

Moreover, there is no doubt in this case that Murray is conscientiously opposed to participation in all wars rather than selectively opposed only to those wars which his conscience dictates as unjust.

"In regard to being opposed to war in any form, it is difficult for me to place myself in the position of what I would have done in past wars. Also, in thinking of the wars of the past, one must take into account the technological advances that have come about in recent years; the tremendous ability to kill using highly sophisticated weapons that were not available a few years ago, the hydrogen bomb which can devastate square miles of any given area killing all forms of life without regard to who might be innocent or guilty. For these reasons, I think it is irrelevant to discuss what I would do if faced with any war of the past. I am opposed to war in any form. The above-mentioned facts make war, now or in the future, all the more inconceivable to me."

Hence, it must be concluded that the board in refusing to reopen in the face of a classic and clearly stated *prima facie* claim violated 32 C.F.R. § 1625.4.

### Subject Matter Jurisdiction and Related Matters

For the reasons stated in Murray v. Vaughn, 300 F.Supp. 688 at 694–696 (D.R.I.1969), this court holds that there is jurisdiction pursuant to 28 U. S.C. § 1331. Murray submitted sufficient proof that his claim exceeded $10,-000 in value. See *supra* p. 22 and n. 44.

In so far as the defendant Director of the Peace Corps, and the defendant Local Board No. 3 are concerned, jurisdiction is well founded also upon 28 U.S.C. § 1361 in that these defendants violated previously described affirmative regulatory obligations owed to the plaintiff. See Murray v. Vaughn, 300 F.Supp. 688 at 696–697 (D.R.I. 1969).

The court reaffirms its holding in Murray v. Vaughn, regarding foreign policy executive discretion. 300 F.Supp. 688 at 697–698 (D.R.I.1969).

With respect to the difficult question of whether 50 U.S.C.App. § 460(b) (3) is a bar to the pre-prosecution review here sought the court must add some further discussion in light of trial developments. First, with respect to Count I of Murray's claim, the court has found that no conspiracy existed, and hence only that portion of its previous

decision which appears at paragraphs 21 and 22 of 300 F.Supp. 688 (D.R.I.1969) is now controlling as the law of the case with respect to Count I. To that law, the court adds the following comments. The reasons stated in National Student Association, Inc., v. Hershey, 412 F.2d 1103 (D.C.Cir. June 6, 1969) for the court's holding that § 10(b) (3) was not a bar would seem equally applicable in the instant case. As to Count I, there is here no claim of any specific lawlessness on the part of either Local Board No. 3 or R.I. State Selective Service. Hence, there is here no "judicial review of the classification of processing" of Murray. Rather relief must be given to Murray against Selective Service only as ancillary to the court's determinations of the First Amendment violation by the Peace Corps and of the existence of a causative connection between that violation and Murray's I–A classification. Additionally, there is here no interference with the processing of Murray, as this suit was commenced post-induction refusal but pre-criminal prosecution. Moreover, while § 10(b) (3) is constitutional on its face and as applied in certain instances, see Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), it is by no means certain that its application to Count I of the instant complaint would be deemed constitutional. In my view, because of the legal barrier which would confront Murray in presenting his Peace Corps "inheritance theory" as a defense to the criminal charge now pending against him, a possible violation of due process exists, if § 10(b) (3) is deemed to bar pre-prosecution review. For this reason and for the reasons previously stated, the court reaffirms its holding that § 10(b) (3) is no bar to the exercise of equity power in this pre-prosecution case.

With respect to Count II of the original complaint, which has been supplemented by further claims of regulatory lawlessness during trial, the court points out that it has not as a matter of fact found any punitiveness on the part of Local Board No. 3. To that extent, one element, upon which the court previously grounded its Count II § 10(b) (3) holding, is now removed. However, the court will not modify its holding that regulatory lawlessness permits pre-prosecution judicial review. The court notes that the issue of whether regulatory lawlessness, which is sufficient to void an order to report for induction, is reviewable in a pre-prosecution, post-induction refusal civil suit is one which is now before some of the federal trial courts. See, e. g., Weiner v. Local Board No. 4, 302 F.Supp. 266 (D.Del.1969); Hunt v. Local Board No. 197, 300 F.Supp. 467 (E.D.Pa.1969). The court need not discuss the variant fact patterns of each of the cited cases in order to reaffirm its previous holding, which is predicated upon a clear violation of regulation, sufficient to void an order to report for induction, in the absence of any fact-weighing problem, and prosecuted in a civil suit after the classification-induction process has terminated in refusal to step forward but prior to criminal litigation. Each of the regulatory violations previously discussed, including (1) the August 9, 1967 failure to vote, (2) the failure to notify Murray of the Kelly memorandum, (3) the wrongful consideration of Murray's case on its merits without granting him personal appearance or appeal rights, and (4) the patently wrongful refusal to reopen Murray's classification upon his submission of a *prima facie* claim for conscientious objector claim, is sufficient to void the order to Murray to report to induction, does not involve fact-weighing, and has been litigated in this post-induction notice, pre-prosecution civil suit. Hence, § 10(b) (3) is no bar as to these claims.

Finally, the court reaffirms its previous holding regarding equity discretion to enjoin the criminal prosecution of Murray. See Murray v. Vaughn, 300 F.Supp. 688 at 702–703 (D.R.I. 1969).

*Rulings and Order*

The defendants' motions for dismissal and judgment are hereby denied. The plaintiff's motion for judgment is granted.

The following order is to be prepared by counsel for plaintiff.

(1) As to the defendant Director of the Peace Corps, it is declared that the First Amendment rights of the plaintiff have been violated by his expulsion from the Peace Corps; it is declared that the Peace Corps violated its own Interim Policy Directive 3.1 in termination procedures relating to the plaintiff; it is ordered that the defendant Director expunge the employment record and any other document in his control relating to the expulsion of the plaintiff from the Peace Corps; and it is ordered that the defendant Director recompute the plaintiff's reassignment allowance so as to reflect the costs of travel from Chile to Washington in June, 1967.

(2) As to the defendant Local Board No. 3 and the defendant Director of R.I. State Selective Service, it is declared that plaintiff's classification for the period from June 28, 1967 to December 31, 1967 be II–A rather than I–A, that the failure of Local Board No. 3 to vote on the plaintiff's requested reopening on August 9, 1967 was lawless, that the failure of Local Board No. 3 and of R.I. State Selective Service to notify Murray of the Kelly memorandum of October 2, 1967 was lawless, that Local Board No. 3's consideration of the merits of Murray's claim on October 10, 1967 without granting to him his rights to a personal appearance and appeal was lawless, and that Local Board No. 3's failure to reopen Murray's classification on October 10, 1967 was lawless; it is ordered that Murray's file be readjusted so as to show a II–A classification for the period between June 28, 1967 and December 31, 1967; and it is ordered that the September 12, 1967 order to report for induction be cancelled.

(3) As to the defendant Attorney General and the defendant United States Attorney, it is declared that the indictment now pending against the instant plaintiff is invalid and it is ordered that all further prosecution of the criminal indictment is hereby enjoined.