**James T. FINLEY**

v.

**Captain John DREW, USN, Commanding Officer, et al.**

**Misc. No. 69–641.**

United States District Court,
E. D. Pennsylvania.

Jan. 26, 1972.

Benjamin Lerner, R. Z. Freemann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for petitioner.

J. C. Undercofler, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION AND CONCLUSIONS OF LAW

TROUTMAN, District Judge.

### Findings of Fact

1. Petitioner, James Terry Finley ("Finley") enlisted in the United States Navy on February 22, 1968. At the time his petition for habeas corpus was filed, Finley was a hospital corpsman stationed at the United States Naval Base at Philadelphia, Pennsylvania. (N.T. 10)

2. Defendants, Captain John Drew, USN, Rear Admiral Kenneth L. Veth,

USN, and Honorable John H. Chaffee, are Commanding Officer of the Philadelphia Naval Station, Commanding Officer of the Fourth Naval District, and Secretary of the Navy, respectively.

3. Finley was not a conscientious objector at the time of his enlistment in the United States Navy. However, he had strong personal reservations about the morality of war and killing. (N.T. 10; R-1)

4. Subsequent to his enlistment Finley was assigned to train as a Hospital Corpsman, a job status he felt was compatible with his then-existing beliefs. (N.T. 10, 12)

5. In October of 1968, Finley was assigned to Camp Lejeune for training as a field medic. During such training he came into contact with members of the United States Marines, many of whom had already served in Viet Nam. (N.T. 11-13)

6. During conversations with many of these servicemen, petitioner's beliefs regarding the immorality of war and killing began to grow stronger, because he found that under the pressures of actual combat many of them "glorified in the killing of people". Realizing that he would be called upon to assist these men on the battlefield as a field medic, and that his work would enable many of them to resume fighting, Finley began to question whether he could continue to serve in the Navy without violating his fundamental religious and ethical beliefs. (N.T. 12-14)

7. It was at this time that petitioner's belief as a conscientious objector began to crystallize. However, he was unaware that a procedure existed by which a conscientious objector discharge could be obtained, unless one was a member of a particular religious sect whose doctrine was opposed to war in any form. (N.T. 14)

8. After the completion of training at Camp Lejeune, Finley was assigned to the Naval Hospital at the Philadelphia Naval Base where he served as a ward corpsman. (N.T. 14)

9. When he began his duties at the Naval Hospital, Finley felt that such activity would not be inconsistent with his developing beliefs concerning the immorality of war and killing or assisting in the killing of human beings, since all but a few of his patients were amputees who were returning to civilian life after recuperating. (N.T. 15)

10. In December of 1968, while Finley was on duty at the hospital, a young patient whom he had gotten to know personally died suddenly as the result of wounds received in battle in Viet Nam. This sudden and, to Finley, totally unnecessary death had a strong impact on him. The more he discussed this experience with family and friends, the more convinced he became that he could no longer serve in the armed forces. (N.T. 16-18; R-1)

11. Still unaware that his beliefs made him eligible for a conscientious objector discharge, Finley decided to go to Canada to avoid compromising his beliefs by further service in the Navy. In May of 1969, while on leave, he did travel to Canada. (N.T. 18-19)

12. Upon arriving there he contacted his father, James Finley, D.D.S., in Brownsville, Texas, and explained to him the religious and moral convictions which had led him to adopt that course of action. (N.T. 20)

13. Finley's father was extremely upset about his son's actions and feared that his son was mentally unbalanced. He urged petitioner to return to Texas, and he agreed to do so. (N.T. 20-21)

14. During his visit to Texas, petitioner, upon his father's initiative, was examined for approximately one hour by Dr. E. E. McClure, a general practitioner (whose practice, according to his letterhead, is limited to internal medicine), and for approximately forty-five minutes by Dr. John Miller, a psychiatrist practicing in Lubbock, Texas. Dr. McClure is a close friend of Finley's family. (N.T. 21-23)

15. Petitioner related to Dr. McClure in some detail his moral and religious

opposition to war and killing, but he found the doctor to be disinterested in his beliefs. (N.T. 24–25)

16. Afterward, Dr. McClure reduced to writing his impressions of his meeting with Finley. His report was submitted to Dr. Finley accompanied by a letter from Dr. Miller which summarized the latter's meeting with Finley. (N.T. 23–25)

17. Petitioner was not then given the opportunity to see the aforesaid letters, which contained statements to the effect that he had an abnormal fear of injury or mutilation, and which did not take into consideration petitioner's expressions of moral opposition to the war and to continued service in the armed forces. (N.T. 25–26)

18. Shortly thereafter, at his father's urging, Finley returned to the Philadelphia Naval Station in order to undergo a psychiatric examination, which was conducted by Dr. P. S. Milstein, LCDR, USNR. (N.T. 26)

19. Without Finley's consent or knowledge, Dr. McClure's report and Dr. Miller's letter were submitted to the Navy. (N.T. 25, 26)

20. By this time Finley had begun to fear that he, in fact, did have an abnormal fear of mutilation or death in combat which was influencing his decision regarding his service in the Navy. Consequently, Finley's discussion with Dr. Milstein, while he was in the Philadelphia Naval Hospital, was directed primarily toward that topic, although there was also some discussion about Finley's religious and moral opposition to war. (N.T. 26–27)

21. The results of Dr. Milstein's examination convinced Finley that his fear of mutilation or death was not abnormal. This conviction reinforced his pre-existing belief that his objections to continuing as a member of the armed forces were based not on an abnormal fear, but on his religious and moral opposition to participating in or supporting any activity which directly resulted in the killing of human beings. (N.T. 27–28)

22. Because of his beliefs regarding the immorality of war and military service, Finley decided to refuse any orders he might receive after his discharge from the Naval Hospital. (N.T. 28, 32)

23. One of the consequences of resolving to refuse orders was that Finley sought civilian counsel to represent him in his anticipated court martial. He was then made aware, for the first time, that he could apply for discharge from the navy as a conscientious objector. (N.T. 29)

24. Accordingly, on or about July 27, 1969, Finley properly filed a formal application for discharge from the United States Navy as a conscientious objector. (N.T. 29)

25. Following the submission of this application, Finley was interviewed by LCDR Robert E. Trent, a Navy Chaplain, who stated "In conclusion, I believe that FINLEY is most sincere in his belief . . . ." (R–1)

26. Finley was then interviewed by LCDR George W. Wire, an officer of O–3 grade or higher. Based on the report of Dr. Milstein and the letters from the civilian doctors given to the Navy without Finley's knowledge or consent, LCDR Wire recommended that petitioner's application for discharge be denied. (R–1)

27. The letters from Drs. McClure and Miller were at no time made a part of petitioner's official service record. Finley was not aware of their contents or aware that they had been given to the Navy until after LCDR Wire had made his final report. (N.T. 6–7; 25–26)

28. LCDR Wire's recommendation was based primarily on his conclusion that the medical report and civilian doctors' letters referred to Finley's alleged fear of mutilation or death, but made no reference to his conscientious objection to the war. (R–1)

29. By letter dated October 7, 1969, the Chief of Naval Personnel informed Finley that his request for discharge as

a conscientious objector had been denied. Such denial was based on the Navy's conclusion that Finley's beliefs were not religious and that they were not sincere because the aforesaid medical reports did not disclose that Finley had ever discussed his moral opposition to war with any of the physicians. (R–1)

30. On December 18, 1969, Finley petitioned this Court for a writ of habeas corpus under sections 2241 and 2243, Title 28, United States Code, to determine the legality of his custody by the United States Navy. (Finley v. Drew, M–69–641, U.S.D.C., E.D.Pa. (1969)).

31. This Court, upon Finley's request, issued a temporary restraining order restraining the Navy from transferring him until a hearing could be held on his petition for writ of habeas corpus. (Finley v. Drew, M–69–641, U.S.D.C., E.D.Pa. (1969)).

32. On January 6, 1970, a hearing on the petition was held by this Court resulting in an agreement by the parties involved that another application for discharge based on conscientious objection should be filed in order to eliminate any irregularities present in the first application. (Finley v. Drew, M–69–641, U.S.D.C., E.D.Pa. (1969)).

33. Accordingly, a preliminary injunction was issued by this Court in order to grant the parties time to effectuate the above-noted agreement. (Finley v. Drew, M–69–641, U.S.D.C., E.D. Pa. (1969)).

34. Finley then filed a second formal application for discharge from the Navy based on conscientious objection. (R–1–A)

35. On or about February 26, 1970, Finley was interviewed by LCDR N. Howard, a Navy psychiatrist, regarding any abnormal fears of death, injury or mutilation which petitioner might have. (R–1–A) LCDR Howard found no evidence of psychosis or other serious psychiatric disorder. (R–1–A)

36. On or about March 5, 1970, Finley was interviewed by LCDR John F. Walker, another Navy Chaplain, who found that "JAMES TERRY FINLEY holds a sincere conviction that his membership in the Armed Forces is morally wrong". (R–1–A)

37. On or about March 24, 1970, petitioner received a second 0–3 interview, this time before Lt. Douglas A. Faulkner, the Naval Station's legal officer. (R–1–A)

38. During a portion of the above-noted 0–3 interview, Dr. P. S. Milstein, the Navy psychiatrist who had interviewed Finley in the Spring of 1969, was present and related the events surrounding that psychiatric examination. (R–1–A)

39. A result of this interview was that Lt. Faulkner concluded in his report that Dr. Milstein's narrative summary relating to his psychiatric examination "was incomplete because neither HA FINLEY nor DR. MILISTEIN [sic] considered FINLEY's conscientious objection to be the purpose for the psychiatric treatment." (R–1–A)

40. In his report Lt. Faulkner further stated: "I do not doubt that HA FINLEY is sincerely opposed to killing other people, but I do believe that this opposition is based on his own personal, moral and philosophical code. . . ." (R–1–A)

41. Consequently, Lt. Faulkner recommended in his report that petitioner's second application for discharge be denied "because his position is not based on religious training or belief. . . ." (R–1–A)

42. On or about June 10, 1970, the Bureau of Naval Personnel rejected Finley's second application for discharge from the United States Navy as a conscientious objector, basing its decision in large part upon the "case history provided by Dr. McClure." (R–1–A) This was done despite the fact that such material was neither a part of Finley's official service record nor Lt. Faulkner's report. (N.T. 6–7; R–1)

43. An evidentiary hearing was held by this Court on June 24, 1970, after which the preliminary injunction issued

on January 6, 1970, was extended until further order to give the parties time to file briefs and present oral argument. (Finley v. Drew, M–69–641, U.S.D.C., E.D.Pa. (1969)).

44. After receiving briefs and hearing oral argument, and after due deliberation, this Court issued the following order:

"AND NOW, this 22nd day of July, 1970, it is hereby

ORDERED

That the petition for writ of habeas corpus be granted; and that the execution of the writ be stayed for a period of sixty days for the purposes of allowing the Government to seek an appeal."

*Discussion*

I.

Initially, petitioner contends that the Navy's use of psychiatric reports of civilian doctors, retained by his father, without affording him adequate opportunity to rebut the information contained in the reports, was in violation of procedural due process of law. In Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955) a copy of the recommendation of the Department of Justice was submitted to the Appeal Board, but was not supplied to Gonzales, a Jehovah Witness, applying for a deferment as a conscientious objector. On the basis of the recommendation, the Appeal Board denied the conscientious objector exemption, and Gonzales was subsequently convicted for refusal to submit to induction into the armed forces. In reversing the conviction, the Supreme Court held that in order to insure a "fair and just" hearing on his claim, a registrant must be afforded a copy of the Justice Department's recommendation and be given a reasonable opportunity to file a reply thereto. Following *Gonzales*, the courts have uniformly held that "inherent in the most narrow view of due process is the right to know of adverse evidence and the op-portunity to rebut its truth and relevance." United States v. Owen, 415 F. 2d 383 (8th Cir. 1969). *See also* Murray v. Blatchford, 307 F.Supp. 1038, 1054–1055 (D.R.I.1969); Wiener v. Local Board No. 4, 302 F.Supp. 266, 270 (D.Del.1969); Nevarez Bengoechea v. Micheli, 295 F.Supp. 257, 258–259 (D.P. R.1969). In Nevarez Bengoechea, the Court held at p. 259:

"The right of the registrant does not end with being furnished with notice of adverse statements but includes the opportunity to rebut them before the Appeals Board decides his case."

The facts of the instant case indicate that upon agreement between the parties, petitioner filed a second formal application for discharge from the Navy based on conscientious objection in order to eliminate any irregularities present in the first application. Petitioner submitted a statement of his beliefs accompanied by supporting letters. Following this application, petitioner submitted to a battery of three interviews conducted by a Navy psychiatrist, a Navy chaplain and a Navy legal officer. In his interview with the Navy legal officer, Lt. Faulkner, Dr. Milstein, the Navy psychiatrist, who examined petitioner prior to the initial rejection of his conscientious objector application, was present. Lt. Faulkner, thereafter, concluded that Dr. Milstein's narrative summary relating to his psychiatric examination was incomplete because neither petitioner nor the doctor considered the conscientious objection claim to be the purpose for the examination. There is no indication in the record that the question of the psychiatric reports of the civilian doctors retained by petitioner's father was ever raised in this interview. There was no indication that Faulkner relied on such reports in making his evaluation of petitioner's claim. The Bureau of Naval Personnel, in ultimately rejecting petitioner's conscientious objector claim, considered his entire service record, including both the original and new applications. The rejection was specifically based on the report of Dr. Milstein,

which was found incomplete by Lt. Faulkner, and on the case history provided by Dr. McClure, the civilian physician. Although petitioner was aware these reports were contained in the record of his initial application, he was not apprised that they would be considered in the determination of his second application. Insofar as petitioner was given no specific notice that this adverse information would be considered in the evaluation of his second application and was given no opportunity to rebut it, we conclude petitioner was deprived of procedural due process of law.

## II.

■ In reviewing conscientious objector claims raised after enlistment into the armed forces, the scope of review is identical to review of conscientious objector claims presented to local draft boards prior to induction: whether there is any basis in fact for the finding that an individual has not presented a valid conscientious objector claim. Pitcher v. Laird, 421 F.2d 1272 (5th Cir. 1970).

Petitioner's second application for discharge as a conscientious objector, together with the supporting letters attached thereto, constituted a prima facie case of entitlement to discharge as a conscientious objector. Absent the reports of the civilian doctors, and the report of the June 12, 1969 examination, there was nothing in petitioner's service record which supported the Navy's conclusion that he was not a sincere conscientious objector, particularly in the light of the fact that two Navy chaplains and Lt. Faulkner, all of whom interviewed petitioner, found him to be sincere in his belief.

■ Assuming these reports were properly considered by the Navy after affording defendant adequate notice and an opportunity to rebut the information contained therein, such reports would nevertheless fail to provide an acceptable basis for denial of the claim for the following reasons:

1. Dr. McClure, a general practitioner, purported to submit a psychiatric evaluation of petitioner. It was unreasonable and improper for the Navy to accept and rely on this information without question.

2. Lt. Faulkner concluded that the Medical Board report of June 12, 1969, was incomplete in that the examination was not conducted for the purpose of petitioner's conscientious objector classification. That report should have been accorded no weight in the evaluation of petitioner's claim. We, therefore, concluded that since the medical report of June 12, 1969, and the report of a civilian doctor constituted the basis of the Navy's decision and since, absent these reports, petitioner's record was devoid of any factor detracting from his claim, there was no basis in fact for the rejection of petitioner's claim.

Accordingly, on July 22, 1970, we granted the petition for habeas corpus.

### Conclusions of Law

■ 1. This Court has jurisdiction over the subject-matter and the parties herein. 28 U.S.C. § 2241 et seq.

■ 2. Habeas corpus is the appropriate means to test the legality of petitioner's custody in the Navy.

3. Petitioner has fully exhausted his administrative remedies.

4. As a result of the Navy's failure to give petitioner adequate notice and an opportunity to rebut adverse information within his records, he was denied his right to procedural due process of law.

5. Since the medical records involved herein were improperly considered and since such records constituted the basis of the Navy's denial of petitioner's claim, such denial was without basis in fact.

6. Petitioner was entitled to a discharge from the United States Navy as a conscientious objector.